*442
 
 OPINION OF THE COURT
 

 Kaye, J.
 

 In this appeal by two closely held corporations — Seagroatt Floral Company and Henry J. Seagroatt Company — we are called upon to answer two questions. First, was the lack of a public market for the corporations’ shares taken into account in valuing the companies for purposes of buying out petitioners’ minority stockholdings under Business Corporation Law § 1118, and second, was it error to impose joint and several liability on the two corporations. We conclude that, while lack of marketability was considered in valuing the stock, the imposition of joint and several liability was error that requires modification of the Appellate Division order.
 

 I.
 

 In the early 1920s, petitioners’ grandfather founded a rose-growing operation, Henry J. Seagroatt, in Berlin, New York. A wholesale business, Seagroatt Floral, was added in 1948. Today, Henry J. Seagroatt sells all of its cut flowers to Seagroatt Floral. Seagroatt Floral distributes cut flowers purchased from Henry J. Seagroatt and other growers, as well as florist supplies.
 

 In 1960 Henry J. Seagroatt and Seagroatt Floral were incorporated as separate entities. Henry J. Seagroatt in 1984 obtained "subchapter S” status pursuant to Federal tax regulations.
 

 All common stock in the two corporations is owned by the founder’s seven grandsons. In addition to common stock, Seagroatt Floral has outstanding 280 shares of preferred stock, owned by individuals other than the seven grandchildren. The two petitioning grandsons, James H. Riccardi and Edward A. Seagroatt, each own approximately 17% of the outstanding common shares of each corporation.
 

 In 1987, petitioners became embroiled in a controversy with the managing shareholders, and sought dissolution of the corporations pursuant to Business Corporation Law § 1104-a. The petitions alleged that the directors had taken "oppressive action” against petitioners.
 

 Each corporation separately elected to purchase petitioners’ shares pursuant to Business Corporation Law § 1118. As a result, Supreme Court stayed the dissolution proceedings and, the parties having been unable to agree upon a price, referred
 
 *443
 
 the matter to a Referee to ascertain the fair value of the stock.
 

 Extensive proceedings ensued before the Referee, including testimony from the shareholders and expert witnesses for both sides. The Referee held that, in order to determine a fair price for petitioners’ shares, the corporations had to be valued as a single business with one consolidated financial statement. He specifically rejected the methods employed by the corporations’ two valuation experts — one using liquidation value and the other assuming that the corporations operated independently.
 

 Based on his findings as to the best method, the proper valuation of tangible assets, and the correct treatment of certain capital disbursements, the Referee adopted the conclusions tendered by petitioners’ expert, with two exceptions. The Referee refused to accept the suggested valuation of the preferred shares (which no one contests), and he rejected as incredible the witness’s testimony that he had taken lack of marketability into account.
 

 While accepting petitioner’s expert’s opinion that the combined net asset value of the two businesses was $9,467,975, the Referee held that a lack-of-marketability discount had erroneously been ignored in the calculation; and on a theory that "a willing buyer would invest in the Seagroatt business only if he could buy a bargain,” the Referee proceeded to discount the expert’s combined net asset value by 25%. He then divided the discounted number ($7,096,481) by the total number of common shares in both corporations (692) to obtain a per-share value, and thus concluded that the 120 shares owned by each petitioner were worth $1,230,603. The Referee further held that each petitioner was entitled to judgment against the corporations, jointly and severally, in that amount. After setoffs and interest, judgment was entered accordingly.
 

 Both sides appealed. Petitioners challenged the 25% lack-of-marketability discount; the corporations argued that it was error to impose joint and several liability. The Appellate Division upheld the imposition of joint and several liability based on the interrelated operation of the businesses. From its own review of the record, however, the court concluded that there was no evidence to support the conclusion that petitioners’ expert had failed to take lack of marketability into account, and it set aside the 25% discount. The corporations now seek to overturn the Appellate Division’s holdings both as to the discount and as to joint and several liability.
 

 
 *444
 
 We agree with the Appellate Division as to the discount; its holding that illiquidity had indeed been considered by petitioners’ expert more closely comports with the weight of the evidence than that of the trial court adopting the Referee’s findings. However, the imposition of joint and several liability — in effect making each separate corporation liable for the purchase of the other’s shares — cannot stand.
 

 II.
 

 Section 1104-a of the Business Corporation Law, enacted in 1979, provides minority shareholders in close corporations with protection from oppressive conduct by majority interests
 
 (see generally, Matter of Pace Photographers [Rosen],
 
 71 NY2d 737, 744-745;
 
 see also,
 
 Sponsor’s Mem in support of A 4408 [L 1979, ch 217], 1979 NY Legis Ann, at 144 ["This legislation will do much to bring fair play and equal rights to corporate shareholders.”]).
 

 The statute allows holders of 20% or more of the outstanding shares of a corporation to present a petition for dissolution based on any of several enumerated grounds, including oppressive acts by the directors or those in control of the corporation (Business Corporation Law § 1104-a [a] [1]). In order to afford the other shareholders the option to continue the enterprise as a going concern, a buyout provision was concomitantly added as section 1118 of the Business Corporation Law. Under that provision, those interested in maintaining the business — a class of "prospective purchasers” explicitly limited to the other shareholders or the corporation itself —may within 90 days of the filing of an 1104-a petition elect to purchase the shares owned by the petitioners (Business Corporation Law § 1118 [a], [b]). Thus, the Business Corporation Law protects both the right of the allegedly oppressed shareholder to liquidate an investment at fair value and the right of the remaining shareholders to preserve an ongoing— and likely prosperous — business
 
 (see generally,
 
 O’Neal, "Squeeze-Outs” of Minority Shareholders, at 613-614 [1975]; Davidian,
 
 Corporate Dissolution in New York: Liberalizing the Rights of Minority Shareholders,
 
 56 St John’s L Rev 24 [1981]).
 

 Given these complementary sections of the Business Corporation Law, the ultimate issue for the courts often becomes fixing the fair value of the minority interest being purchased
 
 (see, e.g., Matter of Joy Wholesale Sundries,
 
 125 AD2d 310;
 
 *445
 

 Matter of Blake v Blake Agency,
 
 107 AD2d 139,
 
 lv denied
 
 65 NY2d 609;
 
 Matter of Fleischer,
 
 107 AD2d 97). In that the valuation proceeding avoids dissolution and allows the continuation of an operating business, the value to be ascertained is that of an interest in a going concern rather than a share of a business in the throes of liquidation
 
 (Matter of Pace Photographers [Rosen],
 
 71 NY2d, at 748,
 
 supra).
 

 Thus, once Seagroatt Floral and Henry J. Seagroatt elected to buy out petitioners, the misconduct charges became irrelevant. The issue became one of valuation.
 

 Business Corporation Law § 1118 offers no definition of fair value and no criteria by which a court is to determine price or other terms of the purchase
 
 (see also,
 
 Business Corporation Law § 623). Rather, fair market value, being a question of fact, will depend upon the circumstances of each case; there is no single formula for mechanical application
 
 (see, Amodio v Amodio,
 
 70 NY2d 5, 7;
 
 see also, Weinberger v UOP, Inc.,
 
 457 A2d 701, 712-713 [Del]).
 

 The objective of a proceeding under Business Corporation Law § 1118 — including the one now before us — is to determine what a willing purchaser in an arm’s length transaction would offer for petitioners’ interest in the company as an operating business
 
 (Matter of Pace Photographers [Rosen],
 
 71 NY2d, at 748,
 
 supra; Matter of Blake v Blake Agency,
 
 107 AD2d 139, 146,
 
 supra).
 

 III.
 

 Valuing a closely held corporation is not an exact science. Accordingly, courts in such proceedings confront a variety of evidence and methods aimed at determining the price of minority interests in closely held corporations — legal entities that by their nature contradict the concept of a "market” value
 
 (see, e.g., Matter of Raskin v Walter Karl, Inc.,
 
 129 AD2d 642, 644;
 
 see also, Donahue v Rodd Electrotype Co.,
 
 367 Mass 578, 328 NE2d 505). The 1979 amendments to the Business Corporation Law were motivated, in part, by recognition of the fact that shareholders in closely held corporations, as contrasted with shareholders in public companies, are unlikely to find prospective buyers for their shares
 
 (see,
 
 Sweet and Mallis,
 
 Standing to Petition for the Judicial Dissolution Under the New York Business Corporation Law: A Needed Change,
 
 contained in Bill Jacket, L 1979, ch 217). It follows that, whatever the method of valuing an interest in such an
 
 *446
 
 enterprise, it should include consideration of any risk associated with illiquidity of the shares
 
 (see generally,
 
 Haynsworth,
 
 Valuation of Business Interests,
 
 33 Mercer L Rev 457 [1982]; 2 O’Neal and Thompson, O’Neal’s Close Corporations § 9.34, at 162-163 [3d ed]).
 

 Petitioners’ expert testified that the method he employed was "capitalization of earnings.” As he explained, he first found average annual earnings for the combined enterprise and next assessed the relative certainty with which those earnings could be counted upon to continue — in effect, he determined the value of those future earnings. The witness testified that he applied a 16% capitalization rate — within the range of Revenue Ruling 68-609, governing valuation of closely held companies for taxation purposes — to what he calculated as the entities’ annual "excess earnings,” and then combined that value with his "tangible asset” value to arrive at the total value for both businesses. He further testified that he did not thereafter apply an illiquidity discount to the value so determined, as he would have done if he had compared respondent corporations with publicly traded companies or over-all industry averages — because his method did not involve such comparisons.
 

 Before us, respondent corporations do not challenge the methodology employed by petitioners’ witness. Rather, their sole contention is that the witness did not properly consider the key risk factor of lack of marketability. They point to language in
 
 Amodio
 
 to the effect that whatever "method [of valuation] is used * * * must take into consideration inhibitions on the transfer of the corporate interest resulting from a limited market” (70 NY2d, at 7,
 
 supra).
 
 Based on this language, the corporations argue that an identifiable discount must in all cases be applied against the value found — that the factor of illiquidity cannot be "buried” in the capitalization rate.
 

 While lack of a public market for the shares of a closely held corporation should certainly be considered in determining what a willing purchaser would pay for such shares— which is the purport of the quoted language from
 
 Amodio,
 
 involving contractual restrictions on transfer — there is no single method for calculating that factor
 
 (see generally,
 
 Lyons and Whitman,
 
 Valuing Closely Held Corporations and Publicly Traded Securities with Limited Marketability: Approaches to Allowable Discounts from Gross Values,
 
 33 Bus Law 2213 [1978]). Certainly, this Court has never mandated
 
 *447
 
 one. Thus, to the extent respondent corporations suggest that illiquidity can only be taken into account by the application of a percentage discount against value — such as the Referee applied — the argument fails as a matter of law.
 

 The corporations’ second argument is essentially factual: the Referee rejected as incredible the testimony of petitioners’ expert that he factored the risk associated with lack of marketability into his formula to determine over-all value. The Appellate Division, on its review of the testimony, concluded otherwise. Our role in such a situation is to determine which findings more closely comport with the weight of the evidence (CPLR 5501 [b]).
 

 Petitioners’ expert testified that he used a capitalization rate he believed was reasonable in the circumstances for pretax earnings for a closely held corporation, taking into account its "position in the industry, its earnings and also lack of marketability, the fact it’s a closely held company.” Despite the Referee’s statement that there was nothing in the record to justify the conclusion that the witness considered lack of marketability, on half-dozen or more occasions the witness repeatedly asserted and explained that lack of marketability had been a factor in his choice of capitalization rate.
 

 The corporations point to what they consider the expert’s outright denial that he had considered illiquidity. An examination of the record, however, indicates that the witness was in the process of explaining his decision not to value the corporations by comparison to publicly traded companies, and the consequent lack of necessity for any discount relevant to such a comparison. The witness’s very next response makes clear that, although a comparative discount was not appropriate, he did indeed factor lack of marketability into his capitalization rate.
 

 Thus, as to the only challenged valuation point, we conclude that there was no error of law, and that the Appellate Division’s findings more closely comport with the weight of the evidence and should be sustained.
 

 IV.
 

 The corporations next argue that imposition of joint and several liability contravenes the explicit statutory grant to an issuing corporation and its shareholders of the right to purchase the company’s own shares (Business Corporation Law
 
 *448
 
 § 1118).
 
 *
 
 Further, they contend that compelling Seagroatt Floral to satisfy the judgment would imperil both the interests of Seagroatt Floral’s preferred shareholders and Henry J. Seagroatt’s status as an "S” corporation. We agree that the imposition of joint and several liability was error.
 

 At the outset, we note that the corporations do not challenge the Referee’s finding that, owing to the business relationships between them, the financial statements of the two companies had to be considered on a consolidated basis in order to portray the fair value of the business. Instead, the corporations argue that consolidation for the purpose of determining value does not require or justify joint and several liability, and that separate values should have been assigned to each entity for purposes of a judgment against them. This argument was advanced at several points during the proceeding, most particularly in the companies’ trial briefs urging that the ultimate issue was to value each entity separately.
 

 Joint and several liability, primarily a tort law concept, imposes on each wrongdoer responsibility for the entire damages awarded, even though a particular wrongdoer’s conduct may have caused only a portion of the loss
 
 (see generally,
 
 Siegel, NY Prac § 168A, at 247 [Prac 2d ed]). The rationale for such liability is that the wrongdoers are considered part of a joint enterprise and a mutual agency “such that the act of one is the act of all and liability for all that is done is visited upon each”
 
 (Ravo v Rogatnick,
 
 70 NY2d 305, 309). The concept of wrongdoing is, of course, alien to a proceeding under Business Corporation Law § 1118, which seeks to determine the fair value of petitioning shareholders’ interests, not their initial allegations of misconduct.
 

 As a general matter, moreover, joint and several liability is inconsistent with the language and goals of Business Corporation Law § 1118.
 

 Section 1118 gives any shareholder or the corporation itself the "absolute right to avoid the dissolution proceedings and any possibility of the company’s liquidation by electing to
 
 *449
 
 purchase petitioner’s shares”
 
 (Matter of Pace Photographers [Rosen],
 
 71 NY2d, at 744-745,
 
 supra).
 
 The statute is quite specific as to which parties may exercise the buy-out option. Unless a second corporation is a shareholder in the company against whom the 1104-a petition has been filed, it does not have standing to make an election to purchase under Business Corporation Law § 1118. It follows from the language of the statute that an entity lacking standing to make the election to purchase cannot be forced to repurchase those very shares through the imposition of joint and several liability.
 

 This reading of section 1118 is supported by sound policy considerations. The purpose behind enactment of a buy-out provision was to provide the corporation or its shareholders with a mechanism for preserving the enterprise as a going concern. Allowing a third party — by satisfying the entire "joint and several” judgment — to purchase the shares of the petitioning shareholder injects an element of uncertainty, a new ownership interest, into the continued operation of the enterprise.
 

 While that consideration may pose less of a problem in cases like the present one, where management and operations overlap, there are other threatened effects on the status of these separate entities. Seagroatt Floral, for example, has an additional class of preferred shareholders; were Seagroatt Floral forced to satisfy the full judgment, the expenditure could affect its ability to pay preferred dividends or, in the event of liquidation, the ability of those shareholders to recoup their investment. Related to such financial concerns is respondents’ argument that this substantial liability — making each potentially liable for the full price of petitioners’ shares in both corporations — harms each entity in its efforts to obtain financing, as each carries the full burden of the judgment.
 

 Similarly, Henry J. Seagroatt claims that purchase of its shares by Seagroatt Floral would jeopardize its status as an "S” corporation for Federal tax purposes. Under Federal regulations, close corporations must meet specific requirements in order to qualify for subchapter S standing, including the requirement that all shareholders must be individuals, estates, voting trusts, temporary conduit trusts, or trusts whose income is taxed to the grantor
 
 (see generally,
 
 26 USC § 1361).
 

 Petitioners contend, and the Appellate Division agreed, that imposition of joint and several liability is appropriate here
 
 *450
 
 because of the "numerous organizational, operational and financial” links between the companies, making them "in reality a single business” (167 AD2d 586, 587). While bearing on the propriety of consolidating the financial statements of the two entities in order to find the true value of petitioners’ shares, those links do not mandate joint and several liability.
 

 Imposition of joint and several liability, in practical effect, disregarded the fact that two legal entities stood before the court. Under ordinary circumstances, a corporation’s independent existence cannot be ignored
 
 (see, Port Chester Elec. Constr. Corp. v Atlas,
 
 40 NY2d 652, 656). Allowing a court— through joint and several liability — to in effect pierce the corporate veils, without the proper inquiry and proof according to established guidelines, undermines bedrock principles of corporate law.
 

 While concluding that it was error to impose joint and several liability on respondents, we do not determine whether the record must be supplemented in order to apportion the total value found, or whether that calculation can be made by the trial court on the present evidence. We note that the parties in their briefs have suggested that there is sufficient basis in the present record upon which the trier of fact might premise separate judgments against each corporation.
 

 Finally, the corporations contend that certain asset valuations were not supported by the record. These valuations, having been found by the trial court, affirmed by the Appellate Division and supported by evidence in the record, are beyond our review
 
 (Humphrey v State of New York,
 
 60 NY2d 742).
 

 Accordingly, the order of the Appellate Division should be modified, without costs, by reversing so much of the order as affirmed the imposition of joint and several liability, and remitting the matters to Supreme Court, Rensselaer County, for further proceedings in accordance with this opinion, and as so modified, affirmed.
 

 Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
 

 Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.
 

 *
 

 [4] Petitioners argue that the joint and several liability issue has been mooted by payment of the judgment. Payment by a losing party does not terminate its right to appeal unless made by way of compromise or agreement not to pursue an appeal
 
 (see, Hayes v Nourse,
 
 107 NY 577;
 
 see also,
 
 CPLR 5523 [court reversing judgment may order restitution]). Moreover, respondents point out that, as a practical matter, they each remain liable for the full amount of the indebtedness that was incurred to satisfy the judgment and stop the running of interest on the judgment.