**ADVANCED COMMUNICATION DESIGN, INC., d/b/a ACD, Inc., Appellant,**

v.

**Brian FOLLETT, Respondent,**

**John Doe, et al., Defendants,**

and

**Brian Follett, third-party plaintiff, Respondent,**

v.

**Marco Scibora, third-party defendant, Appellant.**

No. C1–99–778.

Court of Appeals of Minnesota.

Nov. 2, 1999.

Stephen P. Kelley, Joanne H. Turner, Mackall, Crounse & Moore, PLC, Minneapolis, MN; and Phillip R. Krass, Timothy F. Moynihan, Krass Monroe, P.A., Bloomington, MN (for appellants).

Ruth S. Marcott, Karen M. Charlson, Felhaber, Larson, Fenlon & Vogt, P.A., St. Paul, MN (for respondent).

Considered and decided by CRIPPEN, Presiding Judge, SHORT, Judge, and FORSBERG, Judge.

## OPINION

**THOMAS G. FORSBERG,*** Judge.

Appellants, a corporation and its principal, challenge the district court's decisions that they buy out the stock of respondent, a former shareholder, that respondent had no fiduciary duty to them, and that they pay respondent's attorney fees. Respondent challenges the court's decisions that he receive only one-half his requested attorney fees, that he owned one-third rather than one-half of appellant corporation, and that appellants be permitted to pay for the stock over a ten-year period. Because we see neither error of law nor abuse of discretion in the district court's decisions, we affirm.

## FACTS

When appellant Marco Scibora first formed appellant Advanced Communication Design (ACD), a Minnesota corporation, in 1986, he was its sole shareholder, sole director, and president. In 1990, two ACD vice-presidents, Donald Stein and respondent Brian Follett, each purchased 1,500 shares of nonvoting stock and thus each acquired a one-third equity in ACD. Scibora, Stein, and Follett also signed a shareholder control agreement giving ACD the right of first refusal to purchase any departing stockholder's shares. Stein later left and sold his stock back to ACD.

In January 1996, Fran Scibora, wife of Marco Scibora, joined ACD as its chief operating officer (COO). Her compensation included 1,500 shares of restricted nonvoting stock, to be converted to common stock in 1997 providing that she remained employed by ACD. In October 1996, Marco Scibora demoted Follett from vice-president to manager of special projects and reduced his salary from $70,000 to $55,000; in November, Follett resigned from ACD. Marco Scibora offered to buy Follett's 1,500 shares of stock for $24,646.

The parties sued each other. A jury found Follett guilty of breach of employee's duty of loyalty and interference with contract; ACD's damages were found to be $800. After a bench trial on Follett's claims of bad faith and breach of fiduciary duty, the court ordered appellants to buy out Follett's stock for $475,381 and awarded Follett $87,137 in costs, disbursements, and attorney fees. Appellants' motion for a new trial was denied, and they appeal, arguing that the district court erred as a matter of law in not applying a lack of marketability discount when evaluating Follett's stock and in finding that Follett had no fiduciary duty to appellants ACD or Scibora, and that it abused its discretion in awarding Follett attorney fees and costs. Follett filed a notice of review, claiming that the district court abused its discretion in awarding him only half his requested attorney fees and that it erred in finding that he was a one-third rather than a one-half shareholder of ACD and in permitting appellants to pay for his stock over ten years rather than in a lump sum.

## ISSUES

1. Is a lack of marketability discount applied in the valuation of a minority shareholder's shares when the sale results in the buyer becoming the sole owner of the corporation?

2. Does a minority shareholder have a fiduciary duty to other shareholders or to the corporation?

3. Does a finding of bad faith justify an award of attorney fees to the opposing party?

4. Is it an abuse of discretion to reduce the amount of an attorney fee award when some of the fees requested were incurred in bringing motions and litigating issues on which the party did not prevail?

5. Is stock owned from the time it is acquired even if the shares are restricted?

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

6. Is it an abuse of discretion to permit a minority shareholder's shares to be paid for over a ten-year period when the financial condition of the corporation warrants it and the parties have signed a buy-sell agreement providing that payment may be made by a note maturing in not more than ten years ?

## ANALYSIS

### 1. Lack of Marketability Discount

■ There is no Minnesota law on the application of a lack of marketability discount. However, two recent New Jersey cases address the issue. The question of whether to apply a lack of marketability discount is a question of law, subject to de novo review. *Balsamides v. Protameen Chemicals, Inc.,* 160 N.J. 352, 734 A.2d 721, 732 (1999); *Lawson Mardon Wheaton, Inc. v. Smith,* 160 N.J. 383, 734 A.2d 738, 746–47 (1999).

In *Balsamides,* the court ordered an oppressor shareholder to sell his shares to an oppressed shareholder. *Balsamides,* 734 A.2d at 724–25. The district court applied a 35% lack of marketability discount to the shares; the appellate division reversed, holding that a lack of marketability discount was not appropriate when the transaction "result[ed] in the buyer obtaining total ownership of the corporation." *Id.* at 726 (quoting *Balsamides v. Perle,* 313 N.J.Super. 7, 712 A.2d 673, 683 (1998)). The New Jersey supreme court reversed the appellate division.

[W]e find that courts in deciding whether to apply a marketability discount to determine the "fair value" of shares of a shareholder forced to sell his stock in a judicially ordered buy-out must take into account what is fair and equitable.

\* \* \* \*

To secure a "fair value" for [the oppressor shareholder's] stock, a marketability discount should be applied. To do otherwise would be unfair \* \* \*. The fact that the buyer is known is irrelevant. \* \* \* Because the "equities" of

this case quite clearly lie with [the oppressed shareholder], it would be unfair to allow [the oppressor shareholder] to receive [the corporation's] undiscounted value.

*Balsamides,* 734 A.2d at 735–36. *Balsamides* also distinguishes the instant case: "What to do when it is the oppressing shareholder who is given the buy-out option is a harder question that we need not decide." *Id.* at 738.

*Lawson* concerned a group of shareholders, collectively owning about 15% of the stock, who dissented from a corporate decision to restructure. *Lawson,* 734 A.2d at 741–42. The trial court concluded that a marketability discount was applicable in the appraisal of their shares because "extraordinary circumstances" were present in that the dissenters had "exploited a change they themselves championed and possibly prevented an IPO (initial public offering) to the detriment of other shareholders." *Id.* at 744. The appellate division affirmed. *Id.* at 745. The New Jersey supreme court reversed:

The very nature of the term "fair value" suggests that courts must take fairness and equity into account in deciding whether to apply a discount to the value of the dissenting shareholders' stock in an appraisal action. \* \* \* There is no reason to believe that "fair value" means something different when addressed to dissenting shareholders \* \* \* than it does in the context of oppressed shareholders.

\* \* \* \*

[M]arketability discounts should not be applied in determining the "fair value" of a dissenting shareholder's share in an appraisal action.

\* \* \* \*

The dissenters in this case wanted liquidity for their stock and wanted to sell their stock in a corporation now controlled by new management in whom

they lacked confidence. That is not an "extraordinary circumstance."

*Id.* at 748–50.

The supreme court reconciled its holdings in *Lawson* and *Balsamides:*

> In both cases, we apply the same guiding principle—a marketability discount cannot be used unfairly by controlling or oppressing shareholders to benefit themselves to the detriment of the minority or oppressed shareholders.

*Lawson,* 734 A.2d at 752; *Balsamides,* 734 A.2d at 738.

■ In this case, that principle precludes the application of a marketability discount to Follett's shares.

## 2. Fiduciary Duty

■ Appellants argue that as a minority shareholder Follett had a fiduciary duty to Scibora, a fellow shareholder. In support, they cite *Evans v. Blesi,* 345 N.W.2d 775, 777 (Minn.App.1984) (finding a fiduciary relationship between partners of a closely held corporation who had shared "equal salaries, management duties and benefits" for 22 years). Evans is distinguishable: Follett and Scibora never operated as equals.

■ Appellants also claim Follett had a fiduciary relationship to ACD, relying on *Foy v. Klapmeier,* 992 F.2d 774, 778–79 (8th Cir.1993) (finding that a 5% shareholder had a fiduciary duty to the corporation "as an officer and director") and on *Medtronic, Inc. v. ConvaCare, Inc.,* 17 F.3d 252, 255 (8th Cir.1994) (finding fiduciary duty on the part of "a one-third shareholder of a closely held corporation with the power to appoint two of five directors to the board"). Again, these cases are distinguishable. Follett was never a director, he ceased being an officer before the events complained of occurred, and he had no power of appointment. Follett had only nonvoting stock in ACD; he in no sense controlled the corporation. He had no fiduciary duty.

## 3. Attorney Fees

■ The district court awarded Follett attorney fees pursuant to the buy-sell agreement (providing that, in any enforcement action, the prevailing party would be entitled to attorney fees and costs), and to Minn.Stat. § 302A.467 (1998) (providing that a court may grant attorney fees to a shareholder who brings an action against a corporation, an officer, or a director who violates Chapter 302A). The decision to grant equitable relief is reviewed under an abuse-of-discretion standard. *Foy,* 992 F.2d at 779.

■ The court found that Scibora acted in bad faith towards Follett on six separate occasions. Appellants challenge those findings, arguing that Scibora's acts did not violate Follett's reasonable expectations of his relationship or his reasonable economic expectations. But a finding of bad faith is contingent on the intent of the perpetrator, not on the effect on the victim. Appellants do not show that Scibora did not act in bad faith or that the attorney fee award was unjustified.

## 4. Discounting of Attorney Fees

■ The district court reduced the $143,000 Follett requested in attorney fees by one-half. The decision to grant equitable relief, such as attorney fees, is reviewed under an abuse-of-discretion standard. *Id.* Follett challenges the reduction.

■ It is important "for the district court to provide a concise but clear explanation of its reasons for the fee award." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), quoted in *Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 543 (Minn.1986). Here, the district court explained that Follett was seeking attorney fees for "pretrial motions that were not decided in his favor and for issues at trial where the jury awarded a verdict to ACD." There was no abuse of discretion in the district court's

decision to award half rather than all the amount Follett requested.

### 5. Ownership of Restrict Shares

Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Minn. R. Civ. P. 52.01.

■ It is undisputed that, when Follett resigned on November 18, 1996, he had 1,500 shares and Scibora had 1,500 shares. The district court found that Follett had "one-third (⅓) of the stock in ACD" because Fran Scibora also had 1,500 shares, pursuant to a document headed "Action of Board of Directors" and dated "Effective July 1, 1996," which provided that "the Corporation hereby grant[s] to Fran Scibora 1,500 of its non-voting common shares * * * pursuant to the terms of the Restricted Stock Award Agreement * * *." That agreement provided that Fran Scibora "[had] all of the rights of a shareholder and owner" and that, if she continued to be employed by ACD, half her restricted stock would be converted to common stock on January 1, 1997, and half on July 1, 1997. Therefore, contrary to Follett's argument, the fact that her 1,500 shares of stock were restricted did not mean that she did not own them on November 18, 1996. Moreover, Follett testified that he took a tax loss in 1996 based on ownership of one-third, not one-half, of ACD.

The finding that Follett owned one-third of ACD was not clearly erroneous.

### 6. Payment Over Ten Years

■ The district court found that it would "result in an unreasonable hardship and would be unreasonable under all of the circumstances of the case" to order that Follett's stock be purchased in one lump sum and allowed appellants to purchase it in part with a ten-year promissory note.

Findings of fact will not be set aside unless clearly erroneous. Minn. R. Civ. P. 52.01.

The court's finding was based on its assessment of ACD's financial condition. Moreover, the buy-sell agreement signed by Scibora and Follett in 1994 provided that, when the corporation purchased a shareholder's shares, payment was to be "in cash or by promissory note, or partly in cash and partly by note * * * [which] shall mature in not more than ten (10) years." The court did not err in ordering payment to be in part by promissory note payable over ten years.

### DECISION

There was no error of law in the district court's decision not to apply a lack of marketability discount in evaluating the minority shareholder's stock or in its determination that a minority shareholder owed no fiduciary duty to his fellow-shareholders or to the corporation and there was no abuse of discretion in the reduced award of attorney fees, in finding that the minority shareholder owned one-third of the corporation, or in permitting payment over a ten-year period.

**Affirmed.**