ADVANCED COMMUNICATION
DESIGN, INC., d/b/a ACD, Inc.,
petitioner, Appellant,

v.

Brian FOLLETT, Respondent,

John Doe, et al., Defendants.

Brian Follett, third-party plaintiff,
Respondent,

v.

Marco Scibora, third-party
defendant, Appellant.

No. C1–99–778.

Supreme Court of Minnesota.

Aug. 3, 2000.

Rehearing Denied Aug. 29, 2000.

Joanne H. Turner, Mackall, Crounse & Moore, PLC, Minneapolis, for appellant.

Ruth S. Marcot, Felhaber, Larson, Fenlon & Vogt, P.A., St. Paul, for respondent.

## OPINION

STRINGER, Justice.

We granted review to consider whether, in a court-ordered buy-out of a minority shareholder pursuant to Minn.Stat. § 302A.751 (1998), a marketability discount should be applied to the value of the shares, and whether in a closely held corporation a minority shareholder with only nonvoting shares owes a fiduciary duty to the corporation or its other shareholders.

Appellant Advanced Communication Design, Inc. (ACD) brought suit against respondent Brian Follett (respondent), a shareholder and former employee, alleging several claims including breach of fiduciary duty as a minority shareholder. Respondent counterclaimed against ACD and filed a third-party complaint against its President Marco Scibora (appellant Scibora) requesting that the trial court judicially intervene to dissolve ACD or grant other relief pursuant to section 302A.751 based on conduct respondent claims was unfairly prejudicial to him. The trial court found that appellant Scibora had acted in an unfairly prejudicial manner toward respondent and ordered appellants to purchase respondent's shares in ACD at a price that did not include a marketability discount. The trial court also held that respondent did not owe ACD a fiduciary duty as a minority shareholder. The court of appeals affirmed on both issues. We affirm as to the court of appeals ruling on the fiduciary duty of a minority shareholder but reverse and remand as to application of a marketability discount.

Appellant Scibora founded ACD in 1986 to engage in the business of voicemail and integrated voice response (IVR) systems [1] and from its inception has been its President, its sole voting shareholder, and its only Director.[2] Respondent joined ACD as a vice-president in 1988 and worked primarily with ACD's voicemail and IVR technologies.

In 1990, respondent and Don Stein, another employee, each purchased 1500 shares of ACD's Class B nonvoting stock resulting in ownership of ACD divided equally among appellant Scibora, respondent and Stein, but with appellant Scibora owning all of the Class A voting stock. In July of 1994, the three shareholders and ACD entered into a "Stock Purchase and Transfer Restriction Agreement of the Shareholders of Advanced Communication Design, Inc." (buy-sell agreement) which included a provision that if a shareholder's employment is terminated for reasons other than disability or death, the corporation may exercise an option to purchase the terminating shareholder's shares within 90 days. The agreement further provided that if the parties could not agree on a valuation, the value of the shares would be determined in an appraisal by Exponential Business Valuation and Financial Advisory, Inc. (Exponential), or its successor, or any other firm selected by agreement of the parties. Stein terminated his employment with ACD as of December 1995 and was paid $45,000 in severance and for a noncompete agreement and $50,000 for his nonvoting shares. At that time appellant Scibora informed respondent of the purchase price of Stein's stock but did not inform him of the $45,000 payment for the severance and noncompete agreement.

In January 1996, appellant Scibora's wife, Frances Scibora (F. Scibora), who had not been previously employed by the company, was appointed as the Chief Operating Officer of ACD and thus became respondent's supervisor. The letter confirming the terms of her employment stated that her compensation would include a salary of $20,000 and 1500 shares of nonvoting stock in a restricted stock award—750 shares to be issued effective January 1, 1997, and another 750 shares to be issued effective July 1, 1997. The award would be forfeited if she failed to remain an employee of the company during the restricted periods. Respondent was not informed of the restricted stock award to F. Scibora.

The relationship between appellant Scibora and respondent deteriorated and in October 1996, appellant Scibora demoted respondent from the position of vice-president and reduced his salary. Respondent

1. The business later expanded to include music preview systems, video preview systems, and testing equipment sold as Digitrap and Digismart.

2. The articles of incorporation also named Frances Scibora, appellant Scibora's wife, as an initial director of the corporation.

thereupon provided appellant Scibora with a proposal for a severance package. When no agreement could be reached as to the terms, on November 18, 1996, respondent submitted a letter of resignation effective immediately. He retained his ACD stock however.

ACD brought suit against respondent in December of 1996 alleging several claims relating primarily to solicitation of ACD customers and included a claim that respondent breached a fiduciary duty owed to the corporation as a shareholder. Respondent filed a counterclaim against ACD and a third-party complaint against appellant Scibora asserting several claims, including that persons in control of appellant ACD had acted in an unfairly prejudicial manner toward him and that the court should dissolve the corporation or provide other equitable relief pursuant to section 302A.751.

In February of 1997 appellant Scibora sent respondent a letter exercising ACD's option to purchase respondent's shares pursuant to the buy-sell agreement executed in July of 1994. ACD offered to purchase respondent's shares for $24,646 but respondent declined. ACD then sought an appraisal of the shares from Chartwell Financial Advisory, Inc. (Chartwell) because Exponential no longer performed such appraisals.[3] Chartwell appraised the shares at $30,000 and ACD thereupon amended its complaint seeking an order requiring respondent to sell his ACD shares to the corporation at the appraised value pursuant to the buy-sell agreement.

In January of 1998, the parties agreed to a trial court order for another appraisal of the shares, this by a three-member panel with each party appointing one member and the court appointing a third. The appraisers selected by respondent and the trial court joined in a majority report and the appraiser appointed by ACD and appellant Scibora prepared a minority report. The majority appraised ACD as an enterprise at $1,426,143 and respondent's one-third interest at $475,381 but applied a marketability discount of 55%, thus valuing respondent's shares at $213,921. Chartwell, the appraiser selected by appellants, valued ACD as an enterprise at $875,000, and after applying a minority discount of about 75%[4] and a marketability discount of 35%, appraised respondent's stock at $46,665.

The parties' claims were tried in May 1998 in three phases. The trial court first determined that Chartwell was not the successor to Exponential for purposes of ACD's compliance with the buy-sell agreement. Though the trial court never made explicit findings as to the enforceability of the buy-sell agreement, it apparently concluded that ACD breached the agreement by obtaining an appraisal from Chartwell.

The trial court then rejected ACD's assertion that respondent owed ACD a fiduciary duty as a minority shareholder and directed a verdict for respondent on this claim. ACD's remaining claims against respondent were tried before a jury,[5] and respondent's claims against appellants were tried before the court.

---

3. The two individuals who had performed appraisals at Exponential left the company and founded Chartwell.

4. Chartwell appraised the "enterprise value" of ACD as $875,000 but the "marketable minority interest value" as $220,000. As to the discrepancy between these valuations, Chartwell explained that the enterprise value "reflects inherent control of the Company's operations" but that "given [respondent's] ownership percentage at 33.3% of the total shares outstanding, the lack of voting power to control the operations, and the lack of an established market for the securities, we have utilized a standard of value for these shares which is commonly referred to as 'Closely-held Minority Interest Value.' "

5. The jury found that respondent had breached his duty of loyalty to ACD as an employee and intentionally interfered with ACD's contracts with certain customers and that resulting damages totaled $800.

The trial court entered findings that appellant Scibora had acted in bad faith toward respondent because he failed to disclose all of the terms of Stein's severance agreement, did not offer respondent the opportunity to purchase some or all of Stein's stock, did not inform respondent that F. Scibora would receive stock in ACD, and, when attempting to exercise ACD's option to purchase respondent's stock, failed to follow the valuation procedures in the buy-sell agreement and offered to purchase the stock for an unfairly low price. The court found that as of November 18, 1996-respondent's resignation date-he owned one-third of the shares in ACD. The court concluded that pursuant to Minn.Stat. § 302A.751, subd. 1(b)(3) (1998), appellant Scibora's actions had been unfairly prejudicial and ordered him and ACD, jointly and severally, to purchase respondent's shares in ACD for fair value.

The court adopted the majority appraisal report but declined to adopt the marketability discount reasoning that while it may be appropriate to apply such a discount in a sale to a third party, here the court-ordered sale was to a corporation whose only remaining shareholders would be the president, who had acted in an oppressive manner to the selling shareholder, and his wife. In these circumstances the court concluded that applying a discount would interfere with the statutory purposes of protecting minority shareholders and ensuring that court-ordered buy-outs are fair and equitable to all parties. It found the fair value of respondent's shares to be one-third of the majority's appraised value of $1,426,143 of ACD as an enterprise, or $475,381.[6]

The court of appeals affirmed. *See Advanced Communication Design, Inc. v. Follett*, 601 N.W.2d 707, 712 (Minn.App.

1999). Noting no Minnesota precedent and citing two recent New Jersey Supreme Court decisions, *Balsamides v. Protameen Chemicals, Inc.*, 160 N.J. 352, 734 A.2d 721 (1999), and *Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 734 A.2d 738 (1999), the court held that a marketability discount was inappropriate because it would allow the controlling shareholder to benefit at the expense of an oppressed minority shareholder. *See Advanced Communication Design, Inc.*, 601 N.W.2d at 710–11. The court also held that respondent, who "in no sense controlled the corporation[,]" did not owe appellants a fiduciary duty as a shareholder. *Id.* at 711.

**I.**

The issues presented by this appeal are questions of law that we review de novo. *See Balsamides*, 734 A.2d at 732 (applicability of marketability discount presents a question of law); *Lewis v. Knutson*, 699 F.2d 230, 235 (5th Cir.1983) (fiduciary duty of shareholder is a question of law).

We first consider whether the trial court erred when it declined to apply a marketability discount to respondent's shares in ordering a buy-out pursuant to the Minnesota Business Corporations Act, specifically, Minn.Stat. § 302A.751. In section 302A.751 the legislature has provided broad and flexible authority to the court to "grant any equitable relief it deems just and reasonable in the circumstances or * * * dissolve a corporation" in a wide variety of situations including that alleged here–unfair prejudicial treatment of a shareholder or shareholders of a closely held corporation[7] by those in control of the corporation. Minn.Stat. § 302A.751, subd. 1 (1998).[8] The statute provides addi-

---

**6.** The trial court provided in its order dated March 8, 1998, for payment partly in cash and partly by a promissory note payable over 10 years with 10 percent interest.

**7.** Chapter 302A defines a closely held corporation as "a corporation which does not have more than 35 shareholders." Minn.Stat. § 302A.011, subd. 6a (1998).

**8.** Section 302A.751, subdivision 1 states:

tional flexibility in fashioning a remedy, authorizing the court, upon petition, to order a buy-out if it is fair and equitable to all parties:

> In an action under subdivision 1, clause (b), involving a corporation that is not a publicly held corporation at the time the action is commenced and in which one or more of the circumstances described in that clause is established, the court may, upon motion of a corporation or a shareholder or beneficial owner of shares of the corporation, order the sale by a plaintiff or a defendant of all shares of the corporation held by the plaintiff or defendant to either the corporation or the moving shareholders, whichever is specified in the motion, if the court determines in its discretion that an order would be fair and equitable to all parties under all of the circumstances of the case.
>
> The purchase price of any shares so sold shall be the fair value of the shares as of the date of the commencement of the action or as of another date found equitable by the court * * *.
>
> * * * *
>
> If the parties are unable to agree on fair value within 40 days of entry of the order, the court shall determine the fair value of the shares under the provisions of section 302A.473, subdivision 7 [regarding dissenters' rights] * * *.

Minn.Stat. § 302A.751, subd. 2 (1998).

If the court determines that ordering a buy-out is fair and equitable to all parties under the circumstances, it also has broad discretion both in the process and the ultimate determination of the "fair value" of the shares to be sold:

> A court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business:
> * * * *
> (b) In an action by a shareholder when it is established that:
> * * * *
> (3) the directors or those in control of the corporation have acted in a manner un-

The court may appoint appraisers, with powers and authorities the court deems proper, to receive evidence on and recommend the amount of the fair value of the shares. The court shall * * * determine the fair value of the shares, taking into account any and all factors the court finds relevant, computed by any method or combination of methods that the court, in its discretion, sees fit to use, whether or not used by the corporation or by a dissenter.

Minn.Stat. § 302A.473, subd. 7 (1998).

■■■ We first address the meaning of the term "fair value" in the Minnesota Business Corporations Act. Other courts interpreting the term in states' corporations acts have held that fair value is a shareholder's pro rata share of the value of the corporation as a going concern. *See, e.g., Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del.1989). The American Law Institute (A.L.I.) has similarly recommended that fair value should equal the shareholder's proportionate interest in the corporation. *See* 2 A.L.I., *Principles of Corporate Governance: Analysis and Recommendations* § 7.22(a) (1994). We conclude that fair value, in ordering a buy-out under the Minnesota Business Corporations Act, means the pro rata share of the value of the corporation as a going concern. To determine fair value, the trial court may rely on proof of value by any technique that is generally accepted in the relevant financial community and should consider all relevant factors, but the value must be fair and equitable to all parties. *See* Minn.Stat. § 302A.751, subd. 2; Minn. Stat. § 302A.473, subd. 7; *see also Lawson Mardon Wheaton, Inc.*, 734 A.2d at 746

> fairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation, or as officers or employees of a closely held corporation;
> * * * *

Minn.Stat. § 302A.751, subd. 1 (1998).

(noting that to determine fair value a court may rely on any valuation technique that is generally accepted within the relevant financial community).

■ With these general principles in mind, we turn to the issue of whether, in determining the fair value of the stock of a closely held corporation pursuant to section 302A.751, it is appropriate to apply a marketability discount. A marketability discount "adjusts for a lack of liquidity in one's interest in an entity" and should be distinguished from a minority discount, which adjusts for lack of control of the corporation. *Balsamides*, 734 A.2d at 733. The basis for the marketability discount is that shares in a closely held corporation cannot be sold as readily as shares in a corporation with securities traded over an exchange or in an established market and therefore investors tend to pay less, and sometimes significantly less, for such shares. *See, e.g.*, Harry J. Haynsworth IV, *Valuation of Business Interests*, 33 Mercer L.Rev. 457, 489 (1982).

The application of a marketability discount in a court-ordered buy-out is an issue of first impression in Minnesota. Though most courts in other jurisdictions have held that the application of a marketability discount denies a selling shareholder fair value in either a court-ordered buy-out or a dissenters' rights proceeding, courts have disagreed on this issue, particularly in the buy-out context.[9] *Compare Charland v. Country View Golf Club, Inc.*, 588 A.2d 609, 613 (R.I.1991) (declining to apply marketability discount where corporation elected to buy out minority shareholder because it would deny the minority a pro rata share of the value of the corporation as a going concern) *with In re Seagroatt Floral Co.*, 78 N.Y.2d 439, 576 N.Y.S.2d 831, 583 N.E.2d 287, 291 (1991) (stating that illiquidity is a relevant factor

in determining fair value of shares in a buy-out) *and Balsamides*, 734 A.2d at 738 (applying a marketability discount where oppressed shareholder was ordered to buy out oppressing shareholder).

The Rhode Island Supreme Court declined to apply a marketability discount where a corporation elected to purchase the shares of a shareholder who had petitioned the court for dissolution of the corporation. *See Charland*, 588 A.2d at 613. The Rhode Island statute allowed a corporation to avoid dissolution after a petition had been filed by electing to purchase the shares of the petitioning shareholder. *See id.* at 609–10. The court reasoned, in part, that because the oppressed shareholder would receive a pro rata share of the corporation's assets in the event of dissolution, where–in lieu of dissolution–the corporation elects to buy out the shareholder, the shareholder should not receive less than a pro rata share of the corporation's value as a going concern. *See id.* at 613.

In contrast, the New Jersey Supreme Court recently upheld the application of a marketability discount where the trial court ordered that the oppressed shareholder had the right to purchase the shares of the oppressing shareholder. *See Balsamides*, 734 A.2d at 738. The court reasoned that because the illiquid nature of the corporation's shares impacted the value of the corporation as a whole, a marketability discount should be applied to avoid unfairly burdening the oppressed shareholder purchasing the stock. *See id.* at 735–36. The court concluded that if the discount were not applied an oppressed minority shareholder who purchases the shares of an oppressing shareholder would be penalized. *See id.* at 738. The court reconciled its result with that in *Lawson Mardon Wheaton, Inc.*, 734 A.2d at 749–a

---

**9.** Almost all courts addressing fair value for dissenters' shares have declined to apply a marketability discount. *See Swope v. Siegel–Robert, Inc.*, 74 F.Supp.2d 876, 922 (E.D.Mo. 1999); *Lawson Mardon Wheaton, Inc.*, 734 A.2d at 749; *Security State Bank v. Ziegeldorf*, 554 N.W.2d 884, 889 (Iowa 1996); *Cavalier Oil Corp.*, 564 A.2d at 1145; *In re McLoon Oil Co.*, 565 A.2d 997, 1005 (Me.1989); *cf. Columbia Management Co. v. Wyss*, 94 Or.App. 195, 765 P.2d 207, 214 (1988).

case filed by the court the same day declining to apply a marketability discount in a dissenters' rights proceeding–by noting that it applied the same "guiding principle" as in *Lawson*: "a marketability discount cannot be used unfairly by the controlling or oppressing shareholders to benefit themselves to the detriment of the minority or the oppressed shareholders." *Id.* The New Jersey court expressly did not reach the "harder question" of whether to apply a marketability discount where the oppressing shareholder buys out the oppressed shareholder. *Id.*

Our statutory scheme in court-ordered buy-outs is clearly directed toward providing the court maximum flexibility to fashion a remedy "fair and equitable to all parties," Minn.Stat. § 302A.751, subd. 2, and thus a bright-line rule is not appropriate. A result that allows majority shareholders to reap a windfall by buying out dissenting or oppressed shareholders at a discount or that encourages corporate squeeze-outs is contrary to the statutory purpose to provide a remedy to minority shareholders. *See, e.g., In re McLoon Oil Co.*, 565 A.2d at 1005; *Cavalier Oil Corp.*, 564 A.2d at 1145. Similarly, a bright-line rule that would foreclose consideration of a marketability discount in all circumstances could lead to a valuation that is unfair to the remaining shareholders, a result also contrary to the purpose of section 302A.751.

■ The legislative policy of providing Minnesota courts with broad equitable powers to structure a dissolution or buy-out where a shareholder establishes any of the circumstances set forth in subdivision 1 of section 302A.751 is clear and unequivocal, but a remedy must be on terms "fair and equitable to all parties." Minn. Stat. § 302A.751, subd. 2. The A.L.I. in 1994 set forth standards for determining

fair value in dissenters' rights proceedings and recommended that fair value should equal the shareholder's proportionate ownership interest in the corporation, not the specific shares, without a discount for lack of marketability, except in extraordinary circumstances. *See* 2 A.L.I., *Principles of Corporate Governance: Analysis and Recommendations* § 7.22(a) (1994). The A.L.I. further recommended that the extraordinary circumstances exception exists where not applying a marketability discount would result in "an unfair wealth transfer from the remaining shareholders to the dissenting shareholder."[10] *Id.* at 325.

We conclude that establishing a bright-line test as to the applicability of the marketability discount would be inconsistent with this legislative policy of flexibility and fairness to all parties and would hamper the courts' ability to take into account circumstances that would lead to an unfair wealth transfer if the marketability discount were not applied. Therefore, we adopt the A.L.I. standard for court-ordered buy-outs pursuant to section 302A.751 and hold that, absent extraordinary circumstances, fair value in a court-ordered buy-out pursuant to section 302A.751 means a pro rata share of the value of the corporation as a going concern without discount for lack of marketability.

■ In our application of the extraordinary circumstances exception to avoid an unfair wealth transfer, maximum flexibility can be achieved by taking into account factors relevant to fair value, including whether the buying or selling shareholder has acted in a manner that is unfairly oppressive to the other or has reduced the value of the corporation, whether the oppressed shareholder has additional remedies such as those available pursuant to

---

10. An example of an "unfair wealth transfer" is where the exercise of a minority shareholder's appraisal rights in a financially strained corporation with illiquid assets would yield a price far greater than the price that would

actually be paid for the shares in a market transaction. *See* 2 A.L.I., *Principles of Corporate Governance: Analysis and Recommendations* § 7.22, at 325 (1994).

Minn.Stat. § 302A.467 (1998),[11] or whether any condition of the buy-out, including price, would be unfair to the remaining shareholders because it would be unduly burdensome on the corporation. The overarching policy however, is to ensure the buy-out is "fair and equitable to all parties." Minn.Stat. § 302A.751, subd. 2.

■ Finally, we consider whether the extraordinary circumstances exception is met here. The trial court relied extensively on the Restricted Valuation Report of ACD prepared jointly by the Riley Group and the Hawthorne Company and referred to as the majority report. The court accepted the appraised value of ACD as an enterprise at $1,426,143 but rejected the report's recommendation for a marketability discount factor of 55%.

Several aspects of ACD's financial condition set forth in the majority report lead us to the conclusion that rejecting a marketability discount is clearly unfair to appellant Scibora and F. Scibora, the remaining shareholders. Rejecting a marketability discount resulted in respondent's ownership interest in ACD to be valued at $475,381, more than five times the total net worth of the corporation as of the valuation date of November 18, 1996, almost seven times its average annual operating cash flow for the preceding five years, and more than eight times its average net income over the same period.[12] The report further underscores the policy of the corporation to reinvest cash flows to finance the growth of the corporation as a primary consideration in its discount analysis. Given these factors, we conclude that a valuation of $475,381 for respondent's one-third interest in ACD represents an unfair wealth transfer from the remaining shareholders to respondent because it places unrealistic financial demands on the corporation given the financial data presented in the majority report, and in all probability strips ACD of necessary cash flow and earnings for future growth. Respondent thus receives a value for his stock based on the past growth of the corporation, but the remaining shareholders are left with stock in a corporation that has extremely doubtful potential for growth. We therefore hold that extraordinary circumstances exist requiring application of a marketability discount. Any other result would be inconsistent with the statutory requirement that a court-ordered buy-out be "fair and equitable to all parties." Minn.Stat. § 302A.751, subd. 2.

We remand to the trial court to determine the appropriate percentage marketability discount. As the majority appraisal report recommended a discount of 55% and the minority appraisal report recommended a discount of 35%, based on this record we direct the trial court to apply a marketability discount of between 35% and 55% to respondent's pro rata share of the value of ACD in accordance with our ruling herein. The purchase price shall be paid in such installments as the trial court concludes meet the requirements of a fair and equitable buy-out set forth in section 302A.751, subdivision 2.

## II.

■ Appellants also argue that respondent, as a minority shareholder in a closely held corporation, owes a fiduciary duty to the corporation. Generally, only a majority or controlling shareholder owes a fiduciary duty to the corporation or its

---

11. Section 302A.467 provides:
   If a corporation or an officer or director of the corporation violates a provision of this chapter, a court in this state may, in an action brought by a shareholder of the corporation, grant any equitable relief it deems just and reasonable in the circumstances and award expenses, including attorneys' fees and disbursements, to the shareholder.

Minn.Stat. § 302A.467.

12. We rely on the reported financial data for ACD as of December 31, 1996, because we conclude this date is sufficiently close in time to the valuation date of November 18, 1996, to accurately reflect the financial condition of the corporation.

other shareholders, *see Westgor v. Grimm,* 318 N.W.2d 56, 58 (Minn.1982) (stating controlling shareholder has a fiduciary relationship with corporation); *see also Priddy v. Edelman,* 883 F.2d 438, 445 (6th Cir.1989) (holding that absent control of corporation, minority shareholders owed no fiduciary duty to other shareholders), but as appellants note, we have recognized the similarity of the day-to-day operations of closely held corporations to those of partnerships, *see Westland Capital Corp. v. Lucht Eng'g Inc.,* 308 N.W.2d 709, 712 (Minn.1981). We have held that in a closely held corporation where shareholders participate equally in the management of the corporation similar to partners, they may have fiduciary duties to each other requiring them to exercise the highest degree of integrity and good faith in their dealings. *See Fewell v. Tappan,* 223 Minn. 483, 493–94, 27 N.W.2d 648, 654 (1947) (quoting *Venier v. Forbes,* 223 Minn. 69, 74, 25 N.W.2d 704, 708 (1946)); *see generally PJ Acquisition Corp. v. Skoglund,* 453 N.W.2d 1, 19 (stating that Minn.Stat. § 302A.751, subd. 3a (1998) recognizes fiduciary obligations of shareholders of closely held corporations) (Yetka, J., dissenting). But where a shareholder has only nonvoting shares in a closely held corporation and is not a director, as here, clearly any significant ability to control corporate decision-making is lacking. The relationship between appellant Scibora and respondent is not comparable to that of partners because at all times appellant Scibora has owned all of the shares of voting stock and served as ACD's only director. We therefore hold that respondent owed no fiduciary duty as a shareholder to ACD or its shareholders.

Reversed and remanded in part; affirmed in part.