OPINION OF THE COURT
Carolyn E. Demarest, J.
These two actions were tried together before this court without a jury over a period of several weeks beginning on March 5, 2009 and concluding on March 27, 2009. The parties subsequently submitted proposed findings of fact and conclusions of law in June. In the earlier action brought in 2005, plaintiff[1] seeks to recoup various funds advanced to defendant 162 Columbia Heights Housing Corporation (the Corporation) *1026 relating to the litigation and settlement of a lawsuit brought by prior shareholders and occupants of the garden apartment (Gudas v 162 Columbia Hgts. Hous. Corp., index No. 028888/95), which was settled during trial on June 2, 2004 for $550,000, acknowledged to have been paid by plaintiff. In addition, plaintiff seeks to recover $221,000.33 in legal fees paid by plaintiff in the defense of the Gudas action, $20,830 stipulated to have been paid by plaintiff to an architect and a consulting engineer in anticipation of renovation and remedial work to be done throughout the building but whose services defendants contend were provided solely for plaintiffs own benefit and are not chargeable to the Corporation, and $11,709.68 in maintenance charges for the garden apartment stipulated as having been paid by plaintiff following settlement of the Gudas action.* [2]
The later proceeding (index No. 18894/07), brought pursuant to Business Corporation Law § 1104-a, seeks dissolution of the Corporation. In response to this petition, respondents have elected, pursuant to Business Corporation Law § 1118, to buy petitioner’s interest in the Corporation. One of the issues at trial was the valuation of petitioner’s 20% interest. This court previously ruled, applying the formula set forth in Matter of Penepent Corp. (96 NY2d 186 [2001]), that the market value of the building and any other assets of the Corporation, less liabilities of the Corporation, would provide the basis for determining the fair value of petitioner’s interest. (See Matter of McDaniel v 162 Columbia Hgts. Hous. Corp., 23 Misc 3d 784 [Sup Ct, Kings County 2009].) While petitioner adduced expert testimony relating to the market value of the building as a whole on the valuation date, respondents continue to insist that the value of petitioner’s shares is equal to the market value of her apartment alone, less discounts they contend are applicable. This issue will be further addressed infra.
The following are the findings adopted by this court as either undisputed or supported by the credible evidence as found by the court. It is noted that, other than the experts on valuation, no disinterested witness was called to testify by either side de *1027 spite the fact that some of the issues raised might have been conclusively resolved had the attorneys that represented the Corporation been called to testify. The conflicting representations of the parties have, therefore, been assessed largely based upon documents in evidence.
Findings of Fact
1. The Corporation was formed in 1975 under the Business Corporation Law to operate as a cooperative housing corporation. Its primary asset is a landmarked brownstone building known as 162 Columbia Heights, Brooklyn (the building), constructed in the 1840s, containing five units, one per floor.
2. As previously determined by the court, the Corporation, as of May 24, 2007 (the valuation date for the purposes of the dissolution proceeding), currently has five shareholders, Keiko DeLille, Nicodemo Esposito, Anthony Riccio, K.C. McDaniel and Erika McGrath, who each own 400 shares of common stock in the Corporation and have proprietary leases to apartments in the building which vary in size. The total outstanding shares of the Corporation is 2,000. K.C. McDaniel owned, at all relevant times, 20% of the outstanding shares of the Corporation.
3. Petitioner served as vice-president of the Corporation from the time of the purchase of her apartment in July 1988 to the commencement of the Gudas lawsuit in 1995 when Richard Mc-Grath (who died in 1998) resigned as president and Ms. McDaniel assumed the presidency. Petitioner continued to serve as president until October 2001, when she was succeeded by Keiko DeLille in that office and assumed the office of vice-president and treasurer, which she occupied until her resignation as an officer on June 14, 2005. Originally the board of directors included all of the shareholders/tenants, with the possible exception of Gudas.[3] Sometime in or about 1997, when shareholder Craig sold his apartment to Boberg (who subsequently sold to Riccio), the bylaws of the Corporation were amended to authorize only two directors. K.C. McDaniel and Keiko DeLille thereafter served as the only directors until Ms. McDaniel’s resignation on June 14, 2005. She was subsequently replaced by Erika Viveros- *1028 McGrath, who serves on the board with Ms. DeLille to the present.
4. In 1991, the garden apartment (now owned by Esposito) was purchased from Citibank for $95,000. At that time, the garden apartment was in need of a complete renovation in order to be habitable. In September 1995, Gudas commenced an action against the Corporation and its then shareholders (petitioner McDaniel, Keiko DeLille, Richard McGrath, and James Craig) (the Gudas complaint, exhibit l)[4] seeking injunctive and monetary relief against the Corporation and its shareholders. The Gudas complaint alleged that the Corporation and its shareholders had reneged on an agreement to permit Ms. Gudas to renovate her apartment in a manner that would incorporate some part of the basement space into Ms. Gudas’ living space. In addition to counterclaims interposed in the Gudas action, in separate actions, defendants also brought claims against Gudas alleging illegal construction, violations of the proprietary lease, failure to provide necessary access in order to repair the premises, and for damages resulting from violations assessed against the Corporation. (See exhibit 10, stipulation of settlement; exhibit 31, decision and complaint, 162 Columbia Hgts. Hous. Corp. v Gudas, index No. 47094/98, of which the court takes judicial notice.)
5. Because of her expertise as an attorney, especially in the field of real estate, plaintiff McDaniel became president of the Corporation and exclusively managed the litigation until its termination, hiring three separate law firms. Initially, Goldberg & Sunshine were retained but were soon replaced with Stewart, Occhipinti & Makow, LLfJ apparently due to a conflict of interest. The Stewart Occhipinti firm was terminated by petitioner and ultimately brought suit against petitioner and the Corporation, presumably for fees, which action was settled by stipulation entered in the Gudas action (exhibit F). Beginning in 1998, the firm of Gallet Dreyer & Berkey, LLP represented the defendants in the Gudas action and as plaintiffs in their own suit against Gudas until the settlement thereof, earning fees in excess of $300,000. It is acknowledged by defendants that $221,000 of this sum was paid by plaintiff. Although defendants did not expressly authorize the payment of each bill and may not have been aware of the cost of the legal services on a day-today basis, plaintiff, as an officer and board member, had the *1029 authority to pay such bills and defendants were generally aware of the advances made by plaintiff on their behalf.
6. The Gudas litigation was settled on May 10, 2004 by the Corporation paying $550,000 to Ms. Gudas, in return for which Ms. Gudas delivered her shares and proprietary lease to the Corporation (exhibit 10; 11 2 [b]). Ms. McDaniel advanced the $550,000 to the Corporation to enable it to make the settlement payment. Although there had been earlier overtures in November 2002 to settle based upon a sale of the garden apartment on the open market (McDaniel e-mail to Berkey, exhibit 23; McDaniel e-mail to DeLille, exhibit 24), concerns as to whether the sale proceeds would cover the outstanding mortgage and various costs resulting from the need to cure illegal construction seems to have delayed a negotiated resolution. One of the issues was payment of the legal fees of the Corporation which were claimed against Gudas in the lawsuit. This claim was ultimately waived in the final settlement. In the November 2002 discussions, which were directed by the judge presiding over the Gudas case, Gudas proposed a buyout of her interest for $550,000. In an e-mail to DeLille, petitioner appears to dismiss this proposal out of hand as merely a reiteration of an earlier position “except that the number was a lot higher” (exhibit 25). DeLille testified that earlier settlement was not possible because the Corporation lacked the necessary funds.
7. During the pendency of the Goldberg & Sunshine representation, and before commencement of the Corporation’s own suit, Gudas had proposed a settlement in which she would pay $14,000 for the cellar space and would also pay additional maintenance in return for the Corporation’s approval of her occupancy of this space. This alternative, which was “floated” with other shareholders according to plaintiff, was apparently never seriously considered. Other proposals, which did not cover the costs of legal fees, were also rejected. Mr. Goldberg was told to cease unauthorized settlement negotiations and proceed to litigate.
The court finds, particularly in light of the subsequent commencement of the Corporation’s own suit and the allegations contained therein, which defendants ratified in 1999 (exhibits H, I), that all shareholders, other than Gudas herself, concurred in the need and objective to remove Gudas from the garden apartment and seek damages for the destruction allegedly caused by the Gudas construction. See exhibit YY, letter of July 25, 2001 from plaintiff to Boberg regarding potential settlement *1030 discussions held on July 24, 2001, attended by plaintiff and DeLille, counsel Berkey and Gudas and her attorney, Muir, in which various alternatives were rejected by both plaintiff and defendants and clearly indicating that all of the Corporation’s shareholders, other than Gudas, were in agreement that they “wanted [Gudas and Kagel] out of the building.” Reciting that she had “advanced about $50,000” at that point, plaintiff advised Boberg: “If we do not get reimbursed, we can write off what has been paid [through the corporate checking account] but I would need reimbursement.” The minutes of a special meeting of the board of directors held June 6, 2003, signed by both McDaniel and DeLille, recite the Gudas transgressions warranting the termination of her lease (exhibit HHH). There is no merit to the defendants’ contention that petitioner perpetuated the litigation for personal reasons in disregard of the best interests of the Corporation.
8. At the time of the filing of the Gudas lawsuit, the Corporation had directors’ and officers’ (D & O) insurance issued by Reliance National Insurance Company. McDaniel made a timely demand upon Reliance National that it defend and indemnify the Corporation and the individual directors and officers named in the Gudas action.
9. By letter dated November 14, 1995, addressed to McDaniel (exhibit 2), Reliance National declined all coverage of the claims raised in the Gudas complaint against the Corporation and denied coverage to the individual directors and officers as to all but one cause of action alleging dissipation of corporate assets, as to which, Reliance reserved the right to deny coverage based upon any personal profit to the covered individual as a result of his or her actions, fraud or any knowledge of the claim existing prior to August 10, 1994, when coverage became effective. In 2000, Reliance went into liquidation and its obligations were transferred to a receiver with whom plaintiff continued to communicate. Plaintiff contacted the Liquidation Bureau of the New York State Insurance Department, which appeared at a court conference on April 10, 2003 in the Gudas case, and arranged for the submission of claims to the liquidator in Pennsylvania assigned to evaluate such claims against the bankrupt insurer Reliance (exhibit 30, letter of liquidator to plaintiff’s counsel dated Sept. 22, 2008; exhibit 32, DeLille claim).
10. McDaniel did not advise the other shareholders of her receipt of the November 14, 1995 letter from Reliance National *1031 and did not otherwise inform them that Reliance National had denied coverage of the Corporation for the claims raised in the Gudas lawsuit in their entirety or that Reliance National had denied them coverage for all causes of action, except for the seventh cause of action, or that, as to that cause of action, coverage was limited because expenses and indemnity payments were to be allocated between covered and noncovered claims. Rather, throughout the litigation and until June 14, 2005, McDaniel repeatedly advised the shareholders and her co-director DeLille that Reliance Insurance or its Liquidator would reimburse the Corporation and the individuals for at least some of the costs of legal representation at the conclusion of the cases but that they would have to advance the sums necessary to vigorously litigate the actions. Ms. McDaniel told Ms. DeLille that one of the tactical advantages the Corporation had over Ms. Gudas in the litigation was that the Corporation’s attorneys’ fees would be reimbursed by an insurer, whereas Ms. Gudas was required to foot her own attorneys’ fees. When Reliance National announced that it was being placed into liquidation, Ms. McDaniel advised Ms. DeLille that she was familiar with obtaining coverage from insurance companies undergoing liquidation and that the liquidation would not preclude coverage available to the Corporation. On July 25, 2001, in her letter to then shareholder Timothy Boberg advising him of the results of a settlement meeting with Ms. Gudas in which the Corporation had demanded payment of $100,000 from Ms. Gudas, plaintiff advised that, while Gudas said she would not pay anything, both sides considered the proposal whereby the Gudas apartment would be sold to a third party, with respect to which, Ms. McDaniel wrote, “We do have D & O insurance that is potentially available for some of the [attorneys’] fees and/or settlement costs and I will be talking to the insurer to see what we can get contributed from that side” (exhibit YY).
On November 6, 2002, McDaniel sent an e-mail to DeLille and Boberg advising that the parties appeared to be moving forward on settlement and that she had “cautioned [Gudas] that an insurer will need to be involved since what [Gudas] do[es] not pay, the insurer will need to pay” (exhibit 7 [defendants claimed reimbursement for their attorneys’ fees against Gudas in that litigation]). On November 8, 2002, Ms. McDaniel forwarded to Ms. DeLille an e-mail that McDaniel had sent to the Corporation’s attorney describing a discussion she had had with an employee of the claims representative for Reli *1032 anee National, suggesting that even in liquidation, Reliance National would contribute to settlement of the Gudas case but that any settlement would have to be approved by the Liquidation Bureau of the New York State Insurance Department and/or the Pennsylvania Liquidator in bankruptcy (exhibit 9). On November 18, 2002, McDaniel sent DeLille yet another e-mail advising that she had sent a notice to the insurance company and that she would be speaking to the “insurance people” in the future (exhibit 25). No such communication is reflected, however, in the letter of September 22, 2008, from the liquidator reciting the history of the claim (exhibit 30).
11. On or about December 31, 2003, McDaniel provided DeLille, who was in Florida for the holidays, a claims form by e-mail that was required to be filed in Philadelphia that day, claiming $316,994.28 in legal expenses incurred through December 2003 (exhibit 32).
On November 18, 2004, Ms. McDaniel wrote to the lawyer for the Bobergs, who were selling their apartment to Anthony Riccio, in response to a question from the purchaser’s lawyer about the status of the Gudas litigation: “There is no pending litigation. Issues regarding the recovery for the costs of the Gudas case from the D & O insurance carrier are outstanding” (exhibit 29).
12. Following commencement of the Gudas suit, in 1997, plaintiff, the McGraths, Craig and DeLille, the Corporation and the Bobergs, who were in the process of purchasing the Craig apartment, entered into an agreement (1997 Agreement) “to provide for the continued defense of the Action and the prosecution of the counterclaims therein” (exhibit G). The Agreement provides for a common defense by a single law firm, noting that up to that date Goldberg & Sunshine had represented all parties, and includes a waiver of any conflict of interest. The “Continuing Owners” (McGrath, DeLille, Boberg and McDaniel) agreed that the costs of the defense would be paid “from the operating funds of Coop Corp” (previously acknowledged to have been paid by the Corporation from assessments and operating funds), but acknowledged that a special assessment could be voted by a majority of shares to pay such expenses “in lieu of payment from operating funds.” It was further agreed: “In the absence of other agrément [sic] among the parties, Coop Corp. shall direct the joint defense.” A final paragraph provides: “4. In the event of any final determination after trial of any individual liability of any Prior or Continuing Owner, each Prior *1033 Owner and Continuing Owner shall be indemnified and held harmless as as [sic] officer or director of Coop Corp. to the fullest extent available under law.”
The obvious intent and purpose of this Agreement was to confirm that all defendants were joined in a common defense which would be directed by the Corporation through its board of directors, then composed of McDaniel and DeLille, and that the Corporation would bear all costs, both of the litigation itself and any recovery by plaintiff Gudas.
13. At a special shareholders’ meeting held January 5, 1999, defendants Keiko DeLille and Erika McGrath voted to “ratify” the terms of the 1997 Agreement providing for indemnification and payment of all costs of the Gudas action “from assessments and common operating funds of the Corporation,” the substitution of the law firm of Stewart, Occhipinti & Makow for Goldberg & Sunshine, the commencement of a new action against Gudas and Kagel, the costs of which were to also be paid “from assessments and common operating funds of the Corporation,” and the issuance of a notice to cure and notice of termination to Gudas and Kagel. There is no limitation in the written proxies executed by defendants DeLille and McGrath on January 4, 1999 as to the costs to be incurred or paid by the Corporation as a consequence of the litigation and there is no mention of possible insurance coverage for such costs.
This court finds that, at least as of January 1999, defendants McGrath and DeLille had consciously and deliberately authorized the actions of petitioner in prosecuting the litigation on their and the Corporation’s behalf and had agreed that the Corporation, and indirectly, they themselves, would be responsible for the costs. Whatever information they did or did not have at the time regarding the Reliance claim, their execution of the proxies to ratify bound them unequivocally to the commitment made therein as they had an opportunity and a duty to inquire at the time regarding the substance of the items set forth. The court will not relieve them of such commitments based upon ambiguous statements of plaintiff regarding potential insurance coverage or their own realization, in hindsight, that the litigation was extremely costly to the Corporation.
14. Following settlement of the Gudas litigation on May 10, 2004, on June 14, 2005, the annual shareholders’ meeting was held. Apparently in anticipation of this meeting, on May 8, 2005, Ms. McDaniel wrote to her fellow shareholders describing the *1034 financial condition of the Corporation, the physical condition of the building and needed repairs, including modifications to the garden apartment which had not been sold, and raising the need to replace outdated proprietary leases scheduled to expire at the end of 2005 (exhibit 11). This letter was preceded by an exchange of e-mails between McDaniel and DeLille on March 16, 2005, concerning issues to be addressed at a shareholders’ meeting and includes a statement by plaintiff that she was “$750,000 out of pocket” as a result of the “limbo” status of the garden apartment, which DeLille describes as “vacant (owned by Coop)” (exhibit 33).
At the June 14, 2005 annual meeting, attended by all of the shareholders, the Reliance insurance claim was discussed, including additional information supplied to the receiver. Plaintiff then advised her fellow shareholders that little compensation should be expected as the policy would not cover much of the litigation. The minutes, prepared by DeLille, recite that such information was inconsistent with prior representations by plaintiff suggesting “substantially to one hundred per cent” coverage. McDaniel also asserted a claim of ownership of the garden apartment, which was disputed by DeLille and Mc-Grath, whereupon plaintiff resigned as a director and officer without turning over the corporate checkbook or other documents (exhibit 12).
15. Following the settlement of the Gudas litigation and transfer to the Corporation of the shares corresponding to the garden apartment, plaintiff began to pay the maintenance fees on the garden apartment which, like the maintenance assessed on each unit regardless of size or condition, was $1,000 per month. For the balance of the first month, plaintiff paid a prorated sum, and continued to pay $1,000 per month through June 2005, for a total of $11,709.68 (exhibit J), discontinuing such payments when her claim of ownership of the garden apartment was rejected. Plaintiff testified that she believed she had acquired a “beneficial interest” in the garden apartment by virtue of her funding of the settlement and payment of legal fees on behalf of the Corporation, but that DeLille wanted an additional $100,000 for the apartment. Defendant McGrath, who had been receiving plaintiffs maintenance checks for the garden apartment, testified that she never asked why such payments were being made. McGrath, who had her own interest in acquiring the garden apartment, understood plaintiff had funded the Gudas settlement in the best interests of the *1035 Corporation and would be reimbursed from the proceeds of a sale of the apartment. She did not believe plaintiff ever claimed ownership of the garden apartment prior to the June 14, 2005 meeting.
16. However, in an e-mail addressed to plaintiff on June 4,
2004, following settlement of the Gudas action, Ms. DeLille wrote: “I received a call from Gabe Ford, the real estate broker with whom Stuart Kagel works. I advised him that the garden apartment is no longer available for sale — we have a buyer.” The e-mail further indicates that the apartment had not been put on the market for sale to a third party, and that Erika Mc-Grath wanted to move into the apartment and had been advised that “she would have to buy it — sell her unit and buy the garden — assuming that you did not want it, which I told her was highly unlikely” (exhibit HH). At trial, Ms. DeLille acknowledged that plaintiff was expected to acquire the garden apartment, but stated that she expected a negotiation of the price. Ms. DeLille demanded $650,000 for the apartment, assuming that the legal fees advanced by plaintiff were covered by insurance; she did not anticipate plaintiffs claim made June 14,
2005, that she was the de facto owner of the garden apartment. However, Ms. DeLille’s testimony that the shareholders had agreed to sell the garden apartment on the open market and that petitioner had suggested that it be “fixed up” first, is not consistent with the e-mail of June 4, 2004, a year earlier, which clearly indicates that DeLille knew of plaintiffs plan to acquire the garden apartment well before the June 14, 2005 meeting. Ms. DeLille acknowledged that she had seen plaintiffs plans for renovation of the apartment before June 14, 2005. The evidence confirms plaintiffs informal understanding that she had a priority interest in the garden apartment. A de facto right or “beneficial interest” in title to the garden apartment is not, however, established.
The evidence in this case is replete with meticulous documentation created by plaintiff regarding all facets of the Gudas controversy and the instant litigation. Ms. McDaniel took care to obtain signed promissory notes, bearing interest at 2.5%, from Ms. McGrath and Ms. DeLille for the sums she loaned them to cover the $5,000 assessment levied by the Corporation in 2001 (exhibits B, C). In light of this evidence, it is not plausible that, as an experienced real estate attorney, plaintiff would have neglected to reduce to writing a transfer to herself of title to the garden apartment. Her failure to produce any *1036 writing to support the alleged agreement to turn over the garden apartment as compensation for funding the Gudas settlement and legal expenses incurred in that litigation impeaches such claim.
This court concludes, particularly in the absence of any written documentation to support McDaniel’s claim to ownership of the garden apartment as a quid pro quo for her payments of the settlement amount and advancement of attorneys’ fees, that while defendants had agreed to plaintiffs acquisition of the garden apartment, they expected additional consideration to be paid. Since no agreement was reached as to price, and no writing exists to satisfy the statute of frauds, plaintiff never acquired an enforceable right to the garden apartment.
17. After the June 14, 2005 meeting, beginning in July 2005, plaintiff ceased making maintenance payments for her own apartment. Defendants contend that plaintiff owes $48,000 in arrears on her maintenance through June 30, 2009, but acknowledge that the maintenance plaintiff paid on the garden unit should be deducted from this sum, claiming a balance due the Corporation for the period ending June 30, 2009 of $36,290.32.
18. Petitioner vacated her apartment in March 2008. Her apartment remains unoccupied.
19. Prior to her resignation on June 14, 2005, apparently in the expectation that plaintiff was to become the owner of the garden apartment, plaintiff and DeLille had engaged the services of an architect, Annette Goderbauer of A G Arc, Inc., and structural engineer, Robert Sillman, to evaluate general repairs needed to the entire building and those necessary to remedy conditions recited in pending violations, as well as to design a renovation of the garden apartment (e-mails dated May 5, 2004-Aug. 25, 2005 between DeLille, plaintiff, Goderbauer and Sill-man [exhibits T, U, V, W, X, Y, Z, AA, BB, CC, DD, FF, HH, II, JJ, NN, OO]).
20. On June 14, 2004, Architect Goderbauer submitted two separate fee proposals: one to DeLille for renovation of the building, listing structural modifications to the exterior (exhibit NN), and one to McDaniel, as “owner,” for design and construction of the garden apartment (exhibit OO). On August 19, 2005, Goderbauer provided to McDaniel renderings of a model of the renovated garden apartment (exhibit R), following her submission of an invoice to McDaniel alone on August 8, 2005 for partial work completed on design and construction documents *1037 (exhibits S, LL). The text of the transmission indicates that Ms. Goderbauer was not yet aware of the events of June 14. The architects were directed to cease work on the project due to “difficulty with the coop board” on August 25, 2005 (exhibit V). The August 8, 2005 invoice relates exclusively to work done in anticipation of the renovation of the garden apartment to plaintiff’s requirements (exhibits LL, MM; see also “Agreement” of May 9, 2005 between McDaniel as “owner” of the garden apartment and the architectural firm A G Arc, Inc. describing the services to be provided and the charges therefor).
Similarly, the Sillman Agreement for structural engineering services is only with McDaniel and relates exclusively to the garden apartment (exhibit SS). The Sillman invoice dated July 31, 2005 and addressed to McDaniel alone, states it is “For Structural Engineering Services for the period July 1, 2005 to July 31, 2005,” after plaintiff’s resignation following the rejection of her claim to ownership of the garden apartment (exhibit KK). Thus, plaintiff is not entitled to be reimbursed for fees paid to the architect and engineer based upon her speculative ownership of the garden apartment since the services for which these funds were expended did not benefit the Corporation.
21. On October 17, 2005, plaintiff filed a UCC-1 financing statement against the Corporation claiming a security interest in the garden apartment, which was vacated in 2008 by this court. (McDaniel v 162 Columbia Hgts. Hous. Corp., 21 Misc 3d 244 [Sup Ct, Kings County 2008].) A $500 statutory damages award was granted to defendants and remains a credit against plaintiff’s recovery herein. This court finds that plaintiff’s purpose in filing the UCC-1 statement was to impede a sale of the garden apartment and did hinder the Corporation’s ability to obtain a mortgage in order to fund needed repairs.
22. On December 7, 2005, the board of directors, composed of DeLille and newly-elected Viveros-McGrath, accepted an offer from Nicodemo Esposito to purchase the garden apartment from the Corporation for $850,000, as is, with the expectation, expressed in the contract of sale, that the apartment, as well as contiguous public areas, would be renovated at purchaser’s expense (exhibits K, QQ). The transaction closed on May 25, 2006.
23. On June 20, 2006, respondents’ attorney, William Roth, who was holding the proceeds of the sale of the garden apartment in his escrow account, transferred to plaintiff’s counsel, Joseph French, $650,000 to be “applied to principal amounts *1038 due” from the Corporation to plaintiff in reduction of plaintiffs claims. This sum was paid unconditionally with the express direction that it be delivered to plaintiff for her “free use,” “without condition” (exhibits KKK, LLL).
This court finds that such payment did reduce the debt owed by the Corporation by that sum, specifically reimbursing plaintiff in full for the $550,000 advanced upon settlement of the Gudas litigation and for $100,000 of the $221,000 advanced in legal fees. As there is no evidence of any agreement regarding the terms of plaintiffs advance of these funds, the period of the loan or interest to accrue, and particularly in light of her failure to reveal the sums advanced at the time of payment, no interest is due to plaintiff.
24. On May 25, 2007, K.C. McDaniel filed and served a petition to dissolve the Corporation pursuant to Business Corporation Law § 1104-a. On or about July 17, 2007, the Corporation, Keiko DeLille, Nicodemo Esposito, Anthony Riccio and Erika McGrath delivered a notice of their elections to buyout K.C. McDaniel’s interest in the Corporation pursuant to Business Corporation Law § 1118.
25. As of May 24, 2007, the Corporation had no liabilities other than current operating costs and debts owed to K.C. McDaniel that are the subject of the 2005 action. The Corporation had no underlying mortgages, judgments or liens.
26. As of May 24, 2007, the known assets of the Corporation included the building, the balance of the Corporation’s checking account totaling $7,618.11 (exhibit SSS, bank statement), and the balance of the net sale proceeds acquired through the sale of the garden unit held in escrow by Mr. Roth, which had not been deposited in the Corporation’s checking account, totaling $71,138 ($743,138 less the $650,000 payment to plaintiff, less $22,000 paid out for construction costs to benefit the Corporation [exhibit 35]), plus the right to $50,000 held in escrow by Mr. Esposito’s mortgagee which was not paid until 2008.
Discussion
Reimbursement of Legal Fees:
Plaintiff seeks to recoup $221,000 (reduced to $121,000 by payment from Roth’s escrow account on June 20, 2006) acknowledged to have been advanced in attorneys’ fees, plus interest. Defendants contend, notwithstanding the agreement of 1997 and ratification of 1999 (and notwithstanding the acknowledgment of such debt implicit in the payment made in June *1039 2006), that plaintiff is precluded from being reimbursed for such fees pursuant to Business Corporation Law § 722 (a) because she was not acting in good faith, for a purpose she reasonably believed to be in the best interests of the Corporation, in perpetuating the Gudas litigation and has accordingly, breached her fiduciary duty. Defendants cite to plaintiffs failure to reveal the D & O insurer’s disclaimer of liability and her repeated assurances that the legal fees would be compensated by such insurance at the end of the litigation, the failure to discuss the terms of a proffered settlement which would have permitted Gudas to remain in occupancy upon the purchase of the right to occupy a portion of the basement and pay additional maintenance therefor, and the alleged disproportionality between the value of Gudas’ interest in the basement space (purportedly only $15,000) and the legal fees incurred in the litigation (in excess of $335,000) as evidence of bad faith. Scrutiny of the evidence leads this court to reject such argument.
Business Corporation Law § 722 (a) expressly authorizes indemnification for attorneys’ fees where the officer and/or director to be indemnified “acted, in good faith, for a purpose which he [or she] reasonably believed to be in . . . the best interests of the corporation.” (See Baker v Health Mgt. Sys., 98 NY2d 80, 84 [2002].) In Baker, it was noted that the statute, as amended, “was expressly intended to cover expenses incurred in settling claims.” (Id. at 87.) Consistent with legislative intent (see Baker at 87), article VII of the Corporation’s bylaws tracks the statutory mandate in providing such indemnification “except in relation to matters as to which such director or officer is adjudged to have breached his duty to the Corporation” (exhibit M). Thus, a legal limitation on an officer or director’s right to indemnification for the expenses of litigation arises as a matter of public policy where there is a determination that such individual acted in bad faith or was deliberately dishonest with respect to a material issue in the subject litigation or gained financially or derived a personal advantage to which he or she was not entitled. (Bansbach v Zinn, 1 NY3d 1,13 [2003]; Biondi v Beekman Hill House Apt. Corp., 94 NY2d 659, 665 [2000].) The termination of litigation by settlement does not create a presumption of bad faith or a purpose which does not serve the best interest of the corporation. (Bansbach at 13; Business Corporation Law § 721). But the statutory qualification would restrict the implementation of the defendants’ 1997 Agreement, and its 1999 ratification, if, as defendants argue, plaintiff acted in bad faith.
*1040 It is well-settled that, absent a breach of fiduciary duty, the decisions of a board of directors for a cooperative housing corporation are entitled to deference under the búsiness judgment rule. (40 W. 67th St. v Pullman, 100 NY2d 147, 149 [2003]; Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530 [1990]; DeSoignies v Cornasesk House Tenants’ Corp., 21 AD3d 715, 718 [1st Dept 2005].) “[T]he business judgment rule . . . prohibits judicial inquiry into decisions made by cooperative . . . governing boards which are ‘taken in good faith in the exercise of honest judgment.’ ” (Hochman v 33 Park W. Corp., 293 AD2d 650, 651 [2d Dept 2002], quoting Levandusky at 538, quoting Auerbach v Bennett, 47 NY2d 619, 629 [1979].) “Pursuant to the rule, the party [challenging] a governing board’s actions has the burden of demonstrating a breach of fiduciary duty, through evidence of unlawful discrimination, self-dealing, or other misconduct by board members.” (Id.)
Throughout the relevant period, petitioner served as a member of the board of directors, together with all the other shareholders (except Gudas) until 1997, when the size of the board was reduced to two, and thereafter with her co-director DeLille. Although McDaniel, as an experienced attorney and as president of the Corporation, was given full responsibility to manage and conduct the Gudas litigation, she could only do so “subject to the control of the Board of Directors” (bylaws, art iy § 2, exhibit M). Thus, the decisions she made were subject to review and scrutiny, initially by all of the shareholders, and later, by DeLille, each of whom had a fiduciary duty to oversee those decisions and exercise independent judgment regarding the propriety of petitioner’s actions. Ms. DeLille, though perhaps not possessed of the legal education and experience of Ms. McDaniel, is college-educated, has worked in banking as a lending officer and in small business development, has served on several corporate boards, and was vice chair of Community Capital Bank. She has served on the board and as treasurer of the Corporation since prior to commencement of the Gudas action and participated, as did all of the shareholders, in numerous meetings held in anticipation of the suit. Ms. DeLille testified that she and petitioner met together with attorney Israel Goldberg in advance of the litigation.
Defendants rely upon petitioner’s refusal to negotiate an early settlement (see findings 6, 7), her failure to disclose the letter of November 14, 1995 from National Reliance denying coverage (findings 9, 10), her payment of legal fees alleged to be *1041 disproportionate to the Corporation’s interest, the amount of which was allegedly not revealed to defendants, and her ultimate claim of ownership of the garden apartment, as evidencing a dishonest purpose in financing the legal fees incurred in the Gudas litigation, contrary to the best interest of the Corporation and its other shareholders.
DeLille and McGrath both testified that the issue of insurance coverage was raised at every annual meeting. It is apparent from the e-mail correspondence in evidence that McDaniel and DeLille worked closely together on all matters related to the management of the Corporation and had a close personal relationship as well. Both DeLille and McGrath testified that they had had no complaints regarding petitioner’s performance of her duties prior to her resignation and had believed she acted in good faith in the best interest of the Corporation until discovery was conducted in the instant litigation.
The only evidence of a possible breach of duty on petitioner’s part is the suggestion that she had misled her fellow shareholders regarding the potential for insurance coverage of the legal fees and/or any judgment that might be recovered by Gudas and, specifically, that she had failed to alert defendants to the November 1995 disclaimer from Reliance. While this court is troubled by this lapse, the evidence also suggests an honest belief on petitioner’s part, continuing well beyond the settlement of the case, that the insurance disclaimer might be successfully challenged and some recovery could be had. Misguided as this thinking may have been, it does not support a finding that petitioner acted in bad faith. Although she is an attorney, Ms. McDaniel did not serve as respondents’ legal counsel, but retained competent independent counsel to advise her and the board on all legal matters.
Nor is there evidence of self-dealing motivating petitioner’s actions. It is clear that it was the consensus of the shareholders, based upon the egregious conduct of Gudas and Kagel in commencing illegal construction resulting in Department of Buildings violations to the Corporation and possibly undermining the structural integrity of the building, as well as in frustrating needed repairs and maintenance by restricting access to areas of the building, that the Gudas case needed to proceed in order to secure the ouster of these undesirable occupants. Such purpose was believed to serve the interests of the Corporation. The claim that director DeLille was unaware of the cost of the litigation is belied by the claim she submitted to the Pennsylva *1042 nia liquidator containing a recitation of all legal fees as the substance of the insurance claim. (See exhibit 32.) Defendant McGrath also acknowledged filing a similar claim on or about December 31, 2003. These submissions, executed by director DeLille and shareholder McGrath, also preclude the challenge now raised to the reasonableness of the fees as both defendants implicitly endorsed the necessity and reasonableness of the fees paid in submitting the claim. Moreover, despite defendants’ argument that the fees were excessive, the bills from Gallet Dreyer & Berkey, LLP appear to average approximately $300 per hour for legal services, an hourly rate well within the standard rate at the time (exhibit 5). While the law authorizes reimbursement only for those legal fees which are reasonable and which were actually and necessarily incurred, the fact that the fees at issue are conceded to have been paid over the course of nine years of litigation, both by the Corporation and by plaintiff on behalf of the Corporation, without challenge by other directors or shareholders, forecloses the need for further proof at this time.
It is noted that plaintiffs claim is not for reimbursement of fees for legal services rendered exclusively on her own behalf, but is based upon a debt incurred by the Corporation on its own behalf and in defense of all shareholder defendants which was paid by plaintiff. Thus, all defendants would be unjustly enriched were this court to deny this claim.
There is no evidence here to support an adjudication that plaintiff acted in bad faith in advancing legal fees on behalf of herself, her fellow shareholders and the Corporation. To the contrary, the evidence is that she acted specifically to advance the will of the defendant shareholders to remove Gudas and Kagel for the protection of the Corporation which had suffered serious and substantial damage as a result of illegal and improper construction undertaken by Gudas and Kagel that had undermined the structural integrity of the building. Thus, plaintiff has born her burden under Business Corporation Law § 722 to establish that she acted in good faith in what she believed to be the best interest of the Corporation. (See Titley v Amerford Intl. Corp., 249 AD2d 380, 381 [2d Dept 1998].) Moreover, the service of notices as a predicate for removal of Gudas and Kagel is no evidence of an illegal purpose. The service of a notice to cure and notice of termination, though alleged to have been in violation of an outstanding court order, was ratified by defendants (exhibit H) and cannot defeat plaintiff’s right to *1043 recovery of funds advanced in reliance upon express authorization of the shareholders as reflected in the 1997 Agreement and 1999 Ratification.
Defendants’ defense requires this court to infer that plaintiff acted in bad faith, with an ulterior motive, from the beginning of the Gudas litigation. No evidence supports such conclusion. Plaintiff may have been overly optimistic or misperceived the viability of the Corporation’s insurance claim in evaluating the recovery to be had from the D & O insurer, but her actions, even following the settlement with Gudas, indicate she believed the advice she gave her fellow shareholders. As she was not serving as the Corporation’s attorney, she cannot be held responsible for inaccurate legal conclusions. Moreover, several documents in evidence also support the conclusion, contrary to defendants’ contentions, that plaintiff did seek to negotiate an earlier settlement (see exhibits 9, 23, plaintiff’s e-mails to counsel Berkey, dated Nov. 8 and 14, 2002). Gudas’ early offer to purchase the additional basement space for $14,000 or $15,000 and pay additional maintenance clearly would not have been an acceptable cure for the dispute between Gudas and defendants. It is apparent that the decision to litigate against Gudas was made with the approval of the other shareholders and in the belief that the interest of the Corporation was served thereby. Although it is clear that, by June of 2004, Ms. McDaniel was intending to acquire the shares appurtenant to the garden apartment for herself, given that her co-director DeLille was fully aware and supportive of this plan, her suggestion that the garden apartment be transferred to her in liquidation of the debts of the Corporation to her, cannot be said to constitute a breach of her fiduciary duty as she did not actually derive a personal benefit. It is equally reasonable to infer that plaintiffs suggestion was a good faith attempt to mitigate costs to the Corporation in having to publicly market the apartment in order to satisfy its debt to her. In any event, there is no indication that plaintiff made such suggestion until after the Gudas case had been concluded and the subject legal fees had already been incurred and largely paid.
Business Corporation Law § 720 sets forth the standard for actionable misconduct by an officer or director constituting a breach of fiduciary duty. In measuring whether the particular conduct alleged to transgress the standards of good faith adherence to fiduciary duty actually does state a claim, the business judgment rule must be applied so as to defer to the decisions of
*1044 the duly authorized executive unless such decision “ ‘lacked a legitimate business purpose or w[as] tainted by a conflict of interest, bad faith or fraud.’ ” (Hellman v Hellman, 19 Misc 3d 695, 717 [Sup Ct, Monroe County 2008], quoting Amfesco Indus. v Greenblatt, 172 AD2d 261 [1st Dept 1991].) The facts of this case, as found by this court, do not establish the requisite bad faith, self-dealing or fraud required to overcome the presumption under the business judgment rule, that in managing the Gudas litigation duly entrusted to her by her fellow shareholders, plaintiff was acting in good faith for a legitimate corporate purpose. Most of the shareholders expressly endorsed plaintiffs decisions. That, in retrospect, the cost of the litigation may have exceeded the benefit derived therefrom does not give rise to an inference of breach of fiduciary duty, bad faith or self-dealing on plaintiffs part.
Nor is there merit to defendants’ claim that the 1997 Agreement and 1999 Ratification limit the amount of indemnification payable to plaintiff by specifying that the costs of the litigation were to be paid from the operating funds of the Corporation and assessments. Defendants point to the fact that the total fund raised by assessment was $28,000 and that the operating funds derived from maintenance charges provided “an average excess [available to pay legal fees] of $10,500 per year.” (Defendants respondents’ mem on indemnification at 16.)
Defendants misinterpret the plain language and meaning of these documents. The 1997 Agreement expressly provides that a special assessment could be voted on to cover the costs of litigation, presumably at any time. The express purpose of the agreements, consistent with bylaws, article VII, was that the Corporation would indemnify all shareholders for all costs of the Gudas litigation (see findings 12, 13). Nowhere is there a dollar limitation mentioned. The fact that plaintiff paid the Corporation’s obligations to the attorneys as a loan to the Corporation does not diminish her right to full reimbursement. Valuation of Assets under Business Corporation Law § 1118 Election:
Following the sale of the garden apartment to Esposito, on May 25, 2007, petitioner McDaniel moved to dissolve the Corporation pursuant to Business Corporation Law § 1104-a. In response, respondents timely elected, pursuant to Business Corporation Law § 1118, to buy out petitioner’s interest. The issue before this court is the fair value of petitioner’s 400 shares, representing 20% of the Corporation, on the valuation date, May 24, 2007 (see Business Corporation Law § 1118 [b]).
*1045 Business Corporation Law § 1118 provides for the purchase of a petitioner’s shares “at their fair value” (Business Corporation Law § 1118 [a]), but the statute does not define “fair value,” or provide a criteria for its determination. (Matter of Blake v Blake Agency, 107 AD2d 139, 146 [2d Dept 1985]). “The objective in calculating ‘fair value’ is to determine ‘what a willing purchaser in an arm’s length transaction would offer for petitioners’ interest in the company as an operating business’ ” (Matter of Penepent Corp., 96 NY2d 186, 193 [2001], quoting Matter of Seagroatt Floral Co. [Riccardi], 78 NY2d 439 [1991]). As the purpose of the Business Corporation Law § 1118 election is to preserve a corporation from dissolution (Matter of Pace Photographers [Rosen], 71 NY2d 737, 744-745 [1988]), the value of a petitioning shareholder’s interest is not to be based upon the value of the Corporation upon a liquidation (id. at 746). The instant case presents the question of the proper method to be applied in determining the fair value of the shares of a cooperative housing corporation, to which is appurtenant, a proprietary lease for a particular living space.
Most cases treating the issue of judicial valuation under Business Corporation Law § 1118 arise out of a dispute regarding control of a small, closely-held business that is engaged in a profit-making enterprise. Here, however, there is no profit in the operation of the Corporation, the only purpose of which is to provide housing for the five tenant shareholders (bylaws, art I, exhibit M). All of the 2000 shares carry equal voting rights (see exhibit M, bylaws, art II, § 5) and each shareholder owns an equal number of shares regardless of the size or amenities of the apartment appurtenant thereto.[5] The only “return” on the shareholder’s investment is the use of the dwelling space for as long as the shares are held and the possibility of profit upon sale. Thus, the valuation of each shareholder’s equal 20% interest is logically the net asset value of the Corporation as a whole on the valuation date. (See Blake at 146 [“Net asset value is generally the standard applicable in evaluating manufacturing corporations or real estate and investment holding companies”].) Market value is clearly implicated in this analysis as the value of the Corporation’s primary asset, the building, will depend upon appraisal of its value on the valuation date.
*1046 In my decision of February 3, 2009, this court stated that “the fair value of petitioner’s interest will largely depend on the appraisal value of the building at the valuation date, but will also include any other assets, such as bank accounts, less any liabilities, such as debts of the corporation” (Matter of McDaniel v 162 Columbia Hgts. Hous. Corp., 23 Misc 3d 784, 792 n 5 [2009]). At trial, petitioner presented the testimony of her highly-qualified expert, Joel Leitner, a licensed appraiser in New York, New Jersey, Connecticut, and Pennsylvania, who testified that the highest and best use of 162 Columbia Heights on May 24, 2007 was as a single-family residence and that sale of the entire building for such purpose to a single purchaser would result in a maximum return or value, estimated, based on comparable sales in the area, to be $5,600,000 (exhibit P, Leitner report). Mr. Leitner testified that, under the Standards of Professional Practice and Code of Professional Ethics of the Appraisal Institute, “an appraiser for a market value purpose must value a property according to the highest and best use definition” (transcript of Mar. 10, 2009 at 14). Mr. Leitner’s appraisal for the building was based upon its being emptied of all tenants and sold to be “gut renovated” for a single family. His assessment of value at “highest and best use” does not account for the legal impediments to such sale posed by the long-term proprietary leases held by the respondent shareholders who do not intend to vacate their homes in order to maximize petitioner’s return.
In contrast, respondents presented the testimony of Gabriel Ford, a licensed real estate broker, but not a licensed or qualified appraiser, who had actually had prior experience, both in the area, and with this building (see exhibit HH, e-mail indicating that he had marketed the garden apartment). Mr. Ford’s testimony was based upon the market value of petitioner’s apartment sold as a separate element of the building, without regard to the value of the building as a whole. While certainly possessed of knowledge and experience beyond that of a lay person regarding real estate values, his qualifications as an expert do not equal those of Mr. Leitner. However, with that in mind, this court heard, and will consider his testimony. Mr. Ford opined, in a letter to Mr. Roth dated May 9, 2008, that the fair market value of petitioner’s apartment, defined as “the price a financially qualified buyer, knowing all the information available about a property is willing to pay,” was $795,000 in June 2007, inclusive of a broker’s commission of six percent and *1047 transfer taxes. The “net value,” after deducting these closing costs, was $734,000. A further adjustment in value, attributed to the detrimental effect on marketability of the pending litigation, reduced Mr. Ford’s estimate to $550,000 (exhibit 18). Upon cross-examination, when questioned regarding the value of the building as a whole, Mr. Ford agreed that the standard applicable is “highest and best use” and that occupancy as a single-family dwelling would be the highest and best use.
This court rejects the applicability of the highest and best use as a single-family dwelling as a correct measure of the fair value of petitioner’s interest in the circumstances. Petitioner owns a 20% interest in a building which is subdivided into five dwelling units. The Corporation is encumbered in its use of the building by proprietary leases granting occupancy well into the future. It is not reasonable or fair to suggest that the respondent shareholders should be forced to vacate their homes in order to sell the building vacant so as to afford petitioner the maximum possible return on her investment. Given the nature of the Corporation as a residential cooperative, measuring the “fair value” of a single occupant’s interest based upon the highest and best use of the entire structure is not appropriate. A more flexible standard is needed. (See Amodio v Amodio, 70 NY2d 5, 7 [1987] [“There is no uniform rule for valuing stock in closely held corporations. ‘One tailored to the particular case must be found, and that can be done only after a discriminating consideration of all information’ ”], quoting Snyder’s Estate v U.S., 285 F2d 857, 861 [1961]; Matter of Exterior Delite, Inc., 14 Misc 3d 910, 918 [Sup Ct, Bronx County 2006] [“Stocks of closely-held corporations cannot reasonably be valued by application of any inflexible approach; it must be tailored to the particular circumstances”].) Moreover, valuation under Business Corporation Law § 1118, as under Business Corporation Law § 623, “is to be determined on [the minority shareholder’s interest] in a going concern, not in liquidation.” (Matter of Friedman v Beway Realty Corp., 87 NY2d 161, 167 [1995].) To mandate that an asset be sold in order to maximize value, so as to put the Corporation out of business, would be contrary to law.
This court also rejects as determinative, respondents’ reliance on Balk v 125 W. 92nd St. Corp. (24 AD3d 193 [1st Dept 2005]), affirming the holding of the trial court that the valuation of the petitioner’s shares in a cooperative housing corporation, pursuant to Business Corporation Law § 1118, was properly limited *1048 to an appraisal of the market value of the petitioner’s apartment. While most instructive, the case did not implicate competing standards of valuation, as the only evidence appears to have related to the market value of the petitioner’s apartment on the valuation date. A review of the decision of Justice Lewis Bart Stone at trial term reveals that the parties concurred in the use of the market value of the apartment to determine the value of petitioner’s interest. The issue at trial was the appropriate appraisal value. The primary issue on appeal appears to have concerned interest. In the case at bar, however, there are substantial liabilities of the Corporation (primarily debts to petitioner herself) which must be accounted for in the valuation since petitioner, as a shareholder, must bear her portion of this debt of the Corporation. (A factor recognized by Justice Stone in the Balk decision, but found to be irrelevant there as such contingent liability had not accrued upon the valuation date.) In addition, there are assets of the Corporation, apart from the building, that are not accounted for by limiting the valuation formula to the value of petitioner’s apartment. Although, in the absence of other appellate authority, this court would be bound to follow Balk, I do not read Balk as mandating a particular standard of valuation in all cases of a cooperative housing corporation but, rather, as approving the use of the market value of petitioner’s apartment in the particular circumstances presented in that case. Accordingly, this court finds a valuation of petitioner’s shares based upon the total value of the Corporation on the valuation date to be a more appropriate measure in the circumstances of this case.
This court does, however, agree with both experts that appraisal of the building based, not only on physical inspection, but upon the sales comparison approach using sales during the period surrounding the valuation date is the correct method to be applied. The problem arises here that neither expert actually appraised the entire building taking into consideration, not only the petitioner’s apartment, but all of the space, that was occupied by respondents as well as common areas. An examination of the totality of the valuation evidence submitted, including the written reports and testimony of Joel Leitner and Gabriel Ford and exhibit 19, the appraisal by Vicki Negron of Corcoran Group, which was admitted without objection though she did not testify, leads this court to value the entire building on May 24, 2007 at $4,250,000.
Unfortunately, Mr. Leitner’s appraisal and report was premised entirely upon the sale of a vacant “shell” building to *1049 be gut-renovated for occupancy as a single-family residence and his selection of comparable properties was predicated upon such criteria. Thus, the Leitner appraisal disregards the reality of the Corporation as a five unit housing cooperative and most of his “comparables” are really not equivalent to the building owned by the Corporation. As Mr. Leitner testified, “today the sum of the parts is worth less than the whole” (transcript of Mar. 10, 2009 at 18). The closest comparable used in the Leitner Report is 8 Montague Terrace which, though much larger than the building, has a similar view overlooking the harbor and is similarly burdened with tenancies that are not easily terminable. That building sold on January 26, 2007, just four months prior to the valuation date, for $8,000,000 or $741 per square foot. Another proposed comparable, 140 Columbia Heights, which is also larger than the subject building and in much better condition, but which shares its striking views of the harbor, sold on November 20, 2006 for $10,750,000 or $1,553 per square foot. The discrepancy in price per square foot appears to be the result of the fact that 140 Columbia Heights had already been renovated to its highest and best use at the time of sale. Another property, 212 Columbia Heights, though larger and in significantly better condition, is similarly located overlooking the harbor and sold on May 2, 2005, for $8,925,000, or $1,440 per square foot. Again, the significant discrepancy in value seems to be the result of the building’s already having been renovated to its highest and best use prior to the sale.
In response to the court’s question as to the value of petitioner’s apartment alone, Mr. Leitner stated “approximately $950,000, somewhere in that area” (transcript of Mar. 10, 2009 at 32), although, commenting on Mr. Ford’s report, Mr. Leitner did acknowledge that a two bedroom, slightly larger apartment than petitioner’s, on the top floor of the adjacent building at 164 Columbia Heights, in better condition, sold for $772,000 in October 2006 (transcript of Mar. 10, 2009 at 42). Mr. Leitner also acknowledged that the recently-renovated apartment directly below petitioner’s in the building (Riccio apartment) sold in April 2005 for $650,000, a price diminished by the fact that it was sold as a result of a divorce and had been vacant since September 11, 2001 (transcript of Mar. 10, 2009 at 44). Upon cross-examination, Mr. Leitner testified that he was unaware of the instant litigation commenced in 2005 by petitioner, which was pending on the valuation date, but insisted it would not affect the value of the building. Nor did Mr. Leitner believe *1050 that proprietary leases that entitle the present occupants to remain in their apartments to 2050 affect the value of the building (transcript of Mar. 10, 2009 at 46-47). The record also established that Mr. Esposito paid $850,000 for the larger garden apartment on May 25, 2006.
Mr. Ford reported and testified, based on his familiarity with the building and the Columbia Heights location, that the fair value of petitioner’s apartment on the valuation date was $795,000, less closing costs. The value would be further reduced by the pendency of the instant litigation to $550,000. Without providing any documentation to support his comparison of comparable recent sales, Mr. Ford relied upon the sale of an apartment in the adjacent building in October 2006 for $772,000, the 2005 sale in the building of an apartment with a “much larger terrace and rather exquisitely done” for $650,000, and the larger fourth floor apartment at 190 Columbia Heights that sold in September 2006 for $905,000 (transcript of Mar. 10, 2009 at 80). Mr. Ford’s valuation of petitioner’s interest was based exclusively on his inspection of her apartment alone and the cited comparable apartment sales. No consideration was given to other assets or liabilities of the Corporation or to the condition of the building as a whole. Mr. Ford agreed that the highest and best use of the property would be as a one or two family residence. Mr. Ford also stated that Ms. McDaniel’s apartment was and is in need of a complete renovation, although photographs in evidence do not confirm this opinion.
This court rejects respondents’ attempt to establish the fair value of petitioner’s shares based upon the market value of her apartment alone, as such measure fails to account for other-assets and liabilities of the Corporation. Petitioner is the owner of 400 shares of the Corporation, the fair value of which must be ascertained upon the value of the Corporation as a whole on the valuation date. As neither side to this litigation has presented expert evidence which addresses the fair market value of the entire building as used for the Corporate purpose, as defined in the Corporation’s certificate of incorporation (exhibit A), to provide homes for the shareholders, the value of the building, as a component of the fair value of the Corporation as a going concern, is extrapolated from the evidence adduced.
As noted, irrespective of the size of the apartment occupied by the tenant shareholder, each of the five shareholders owns the same number of shares and is entitled to the same number of votes in determining management. On May 25, 2006, exactly *1051 one year prior to the valuation date, the 400 shares appurtenant to the garden apartment were transferred to respondent Esposito for $850,000. These shares are deemed equal in value to those owned by petitioner. Moreover, notwithstanding Mr. Leitner’s ball-park figure that Ms. McDaniel’s apartment (if used to measure her interest in the building) was worth $950,000 on the valuation date, the court rejects such figure in light of the greater size of the garden apartment, including the garden itself and the opportunity to expand the living space into areas of the basement. The physical condition of McDaniel’s apartment was undoubtedly superior to that of the garden apartment upon transfer of the shares, but the additional space offsets this factor, rendering the two apartments of comparable value. Furthermore, the primary reason for this court’s reliance on the sale price of the garden apartment as a measure of what a willing purchaser in an arm’s length transaction would offer for petitioner’s shares (see Matter of Pace Photographers [Rosen], 71 NY2d at 748), is the allocation of the same number of shares to each apartment as representing the shareholder’s actual interest in the Corporation as a whole. All of the tenant shareholders bear equal responsibility for the debts and obligations of the Corporation.
In the circumstances of a cooperative housing corporation, each shareholder enjoys the immediate direct benefit of the occupancy of a dwelling space. The shares of the Corporation are highly marketable for this reason. It is true that, on the valuation date, the pendency of petitioner’s litigation would impair the marketability, and therefore the value, of her interest. However, as both experts testified, there was a rising market during the period 2005 through the May 2007 valuation date which this court finds would offset the decrease in value resulting from the litigation. In virtually all respects, Ms. McDaniel’s shares in the Corporation on the valuation date were of equal value to the same number of shares acquired by Mr. Esposito a year earlier. Thus, this court finds that the fair value of the building on May 24, 2007 was $4,250,000 ($850,000 x 5 blocks of 400 shares). This sum also correlates to the comparable sale, on January 26, 2007, of 8 Montague Terrace, a property bearing most of the attributes of 162 Columbia Heights. Prorating the sale price of $8,000,000 for the larger property at 8 Montague Terrace on a square foot basis, the square foot price is $741. Multiplying $741 by 162 Columbia’s gross building area of 5,860 square feet yields a market value of $4,342,260. This calculation *1052 comports with Mr. Leitner’s explanation as to his method of appraisal using price per square foot in comparing properties and results in a value for the building within 2% of the market value of 8 Montague Terrace.
Petitioner has demanded a surcharge be added to the value of the Corporation based upon her allegations in support of her petition for dissolution pursuant to Business Corporation Law § 1104-a that directors DeLille and McGrath committed waste by failing to fund needed repairs and maintenance to the building, resulting in severe deterioration of the Corporation’s primary asset. However, “[fjixing blame is material under 1104-a, but not under 1118.” (Pace Photographers, 71 NY2d at 746; see also Friedman, 87 NY2d at 168.) This rule is particularly apt here where, as president and as a director prior to June of 2005, petitioner herself was primarily responsible for the management decisions of which she now complains. Moreover, it is she who brought the litigation which has impeded funding the needed repairs. There is no basis in law or fact to consider petitioner’s claim that a surcharge on value is warranted.
Nor is a discount warranted as respondents suggest. Although the pendency of litigation must be considered in assessing fair value since the marketability of the shares will be thereby impacted (Matter of Penepent Corp., 96 NY2d at 193), “there is no single method for calculating that factor” (Seagroatt, 78 NY2d at 446). The instant decision terminates the pending litigation and will free petitioner’s shares to be sold unencumbered by such uncertainty. On the valuation date, it is true, petitioner’s suit for indemnification for attorneys’ fees was unresolved (although she had already been paid $650,000 of her claim nearly a year earlier). However, this court has offset the discount for the litigation impediment against a rising market in relying on the price paid for the garden apartment a year earlier in determining the value of petitioner’s shares on the valuation date. In addition, this litigation factor is also being taken into account with respect to petitioner’s claim for interest. It is noted, moreover, that Mr. Esposito purchased the garden apartment during the pendency of the 2005 litigation, as did Mr. Riccio purchase the Boberg apartment during the Gudas litigation. Thus, it is established that a market exists for the shares, irrespective of the taint of litigation. It is well-settled that any discount premised upon a minority interest is “inconsistent with the equitable principles developed in New York” to provide a fair return to the minority shareholder equal to the value of all other shares (Matter of Friedman, 87 NY2d at 167-169).
*1053 Business Corporation Law § 1118 (b) provides for the discretionary award of interest on value from the valuation date to the date of payment. It has been held that a petitioner is “entitled” to such interest “unless a determination is made that petitioner has acted in bad faith” (Matter of Blake v Blake Agency, 107 AD2d at 150; see also Matter of Schneiderman v Luv-A-Cup Coffee Serv., 204 AD2d 173 [1st Dept 1994]; Hall v King, 177 Misc 2d 126, 136 [Sup Ct, NY County 1998]). Although this court has rejected respondents’ contentions that petitioner acted in bad faith in her pursuit and supervision of the Gudas litigation, petitioner’s behavior subsequent to the Gudas settlement does evidence bad faith which precludes the award of interest on the value of her shares.
Following rejection of petitioner’s claim of entitlement to the garden apartment, petitioner ceased making payments of maintenance on her own apartment. Initially such action may have been warranted in recoupment of petitioner’s voluntary payment of maintenance on the garden apartment. However, her default has continued to the present, notwithstanding that she remains in possession of her apartment, impeding the Corporation’s ability to make the repairs she, herself, has argued are needed. Even more egregious is petitioner’s filing of a completely unwarranted UCC-1 financing statement on October 17, 2005 in which she claimed a security interest in the garden apartment, which was obviously intended to thwart the sale of the apartment to someone else. The effect of such filing would also impede the Corporation’s ability to obtain a mortgage which could have provided funds to pay plaintiff’s claim relating to legal fees and to make repairs to the building. The UCC-1 filing remained in effect until vacated in August 2008 by this court. (See McDaniel, 21 Misc 3d at 244.) The $500 statutory fine assessed remains outstanding.
Thus, petitioner has acted in bad faith in seeking to undermine the Corporation and in prolonging the instant litigation unnecessarily by her repeated interposition of meritless legal ploys. This court declines to award her any interest on the value of her shares. As noted by the Court of Appeals in Matter of Pace Photographers (71 NY2d at 745, quoting Matter of Kemp & Beatley [Gardstein], 64 NY2d 63, 74 [1984]), the “ ‘minority shareholder whose own acts, made in bad faith . . . give rise to the complained-of oppression should be given no quarter in the statutory protection.’ ”
Applying the net asset value method, on the valuation date the Corporation was worth $4,378,756.11 ($4,250,000 as the fair *1054 market value of the building, plus the bank balance of $7,618.11, plus $71,138 in the Roth escrow account from the sale of the garden apartment, and $50,000 held in escrow by Esposito’s lender) less $121,000 due to plaintiff as indemnification for attorneys’ fees paid on the Gudas case, for a net worth of $4,257,755. The fair value of petitioner’s 400 shares, equal to 20% on the valuation date is accordingly found to be $851,551. From this sum must be deducted the $500 unpaid damages award and the unpaid maintenance fees totaling $11,290.32 to the valuation date. Thus, petitioner is entitled to be paid $839,760.68 for her shares upon closing, less maintenance accrued subsequent to the valuation date to the date of closing and any other appropriate closing adjustments.
As noted, petitioner has already vacated her apartment and it is available to be immediately marketed for sale. The parties are directed to submit to the court, proposed terms of sale within five days of the date of this decision. Barring a different agreement between the parties, it is expected that the Corporation will either obtain a mortgage on the building in order to pay the full value of petitioner’s shares or will attempt to sell the apartment in order to fund payment to petitioner. Obviously, a sale of the apartment will delay closing and, should the parties agree to such alternative, specific terms will need to be agreed upon.
Conclusions of Law
1. Plaintiff was reimbursed for the $550,000 advanced as settlement proceeds and $100,000 of the sums advanced for legal fees on June 20, 2006, when $650,000 was transferred to plaintiffs attorney as her agent, without restriction, to be applied to the outstanding debts of the Corporation. No interest is due to plaintiff on these sums. Plaintiffs claim for reimbursement of the $550,000 is dismissed.
2. Judgment for the balance of sums advanced for legal fees, $121,000, is awarded to plaintiff against the Corporation only, without interest. Claims against the individual defendants are dismissed based upon the 1997 Agreement in which all liability for such fees was assumed by the Corporation.
3. Upon plaintiffs claim for $20,830 as reimbursement of professional fees, judgment shall enter in favor of defendants dismissing such claim.
4. Plaintiff is awarded judgment for $11,709.68 as a refund of maintenance fees voluntarily paid by her for the garden apartment, without interest. This sum is deducted from the mainte *1055 nance fees due to the Corporation for plaintiffs apartment for the period July 2005 through May 2007, resulting in a balance due to the Corporation of $11,290.32, which shall be deducted from the value of petitioner’s shares.
5. Plaintiffs claim for attorneys’ fees in the prosecution of index No. 27566/05 is denied and dismissed as there is no basis for such an award. (See Baker v Health Mgt. Sys., 98 NY2d 80 [2002] [denying recovery of attorneys’ fees for litigation necessary to obtain indemnification].)
6. Petitioner’s attempt to obtain an adjustment in fair value based upon allegations of waste in the failure to repair and maintain the premises is dismissed as meritless in light of petitioner’s own responsibility for the failure to maintain as an officer and board member.
7. As respondents have elected, pursuant to Business Corporation Law § 1118, to purchase petitioner’s shares in the Corporation, the petition to dissolve the Corporation is denied.
8. The fair value of petitioner’s 400 shares of the Corporation is found to be $851,551 on the valuation date and respondents are directed to pay her such sum, less all unpaid maintenance, including the $11,290.32 due to the valuation date plus maintenance accruing thereafter at $1,000 per month to the date of closing, and the $500 unpaid damages award based upon petitioner’s improper UCC-1 filing.
9. All parties are directed to submit to the court proposed terms of sale within five days.

. Plaintiff and petitioner K.C. McDaniel will be referred to interchangeably as either “plaintiff’ or “petitioner,” and the Corporation and the individ *1026 nal defendants-respondents will be referred to as either “defendants” or “respondents” depending on the context.

. Plaintiff also interposed claims against defendants DeLille and McGrath individually for a $5,000 advancement made to each of them as a loan to cover a capital assessment by the Corporation in October 2001. At the close of plaintiffs case, upon defendants’ prima facie motion to dismiss, these claims were withdrawn and dismissed for failure of proof that any sums were due and owing on the notes.

. The history of Ms. Gudas’ participation as a shareholder is convoluted. She received her interest, apparently by assignment from her husband, Stuart Kagel, who purchased the garden unit from Citibank in 1991, following a foreclosure against the prior owner. Mr. Kagel remained a guarantor of Gudas’ performance under the lease. Occupancy was apparently delayed due to the need for substantial renovation.

. Lettered exhibits were introduced by plaintiff/petitioner K.C. McDaniel. Numbered exhibits were introduced by the Corporation.

. Bylaws, article V, § 3 authorizes the board of directors to allocate the number of shares for each apartment within the proprietary lease, presumably differentiating the value of each space; however, this has not been done here as each tenant-shareholder owns the same number of shares.